Emmitt VALENTINE, William Coles, Bruce Cunningham, Nathaniel Dash, Winfred Gray, Tony McCutchen, Damon Wilder, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Edwin ENGLEHARDT, Sheriff, Passaic County, John DeYoung, Warden, Passaic County Jail, Edward O'Byrne, Freeholder-Director, Joseph Bubba, Freeholder, Louise Friedman, Freeholder, S. M. Terry LaCorte, Freeholder, James Roe, Freeholder, Joseph Russo, Freeholder-Deputy Director, Cyril Yannarelli, Freeholder, all of Passaic County, New Jersey, and their successors in office, Defendants.

Civ. A. No. 78–270.

United States District Court,
D. New Jersey.

July 18, 1979.

Jeffry A. Mintz, Acting Director, Dept. of Public Advocate, Trenton, N. J., for plaintiffs.

Martin Verp, Passaic County Counsel by Randy R. Kopf and James V. Convery, Asst. County Counsels, Paterson, N. J., for defendants.

## OPINION

STERN, District Judge.

██ In this class action brought pursuant to 42 U.S.C. § 1983 by the inmates of the Passaic County Jail, many of whom are pretrial detainees, the Court must decide whether that institution's visitation regulations, which completely ban all minor children from seeing their incarcerated parents and limit all inmates to a total of thirty minutes of non-contact visiting time a week, with a maximum of two adult visitors, are constitutional. On the basis of the testimony, papers and argument in this case, the Court finds that the Passaic County Jail procedures totally barring visitation by inmates' children are unconstitutional. The Court also finds that the present record is inadequate to permit it to determine the constitutionality of the jail's other visitation practices. Therefore, the Court will refer this case to a Special Master with directions to conduct a thorough examination of all the circumstances surrounding the existing visitation policies at the Passaic County Jail and to report his findings to this Court.

## I. Background

The Passaic County Jail is a three-story structure erected in 1956 and located in downtown Paterson, New Jersey. The jail houses an average population of 300 men and women, of which approximately 65% are pretrial detainees, that is, persons awaiting trial on state charges who remain confined solely because they cannot post bail. It is not unusual for a pretrial detainee to be confined in the jail for three to four months, although the average stay is considerably shorter. The remaining 35% of the inmate population consists largely of individuals who have been sentenced by the State to terms of up to one year, and, to a lesser extent, of individuals awaiting sentence, persons already sentenced who are awaiting transfer to a state prison, and individuals incarcerated in other institutions whose presence is required in Passaic County.

### A. The Complaint and the Issues Raised Pre-Settlement

This action was commenced in February 1978 by seven pretrial detainees, represented by the Office of Inmate Advocacy of the New Jersey Department of the Public Advocate. Defendants are the Sheriff of Passaic County, the Warden of the Passaic County Jail, and individual members of the Board of Chosen Freeholders of the County of Passaic.[1] Plaintiffs, seeking to remedy certain conditions and practices in the jail, allege that numerous aspects of their confinement violate their rights to equal protection and due process of law and constitute cruel and unusual punishment.[2] The

---

1. The Board of Chosen Freeholders is responsible for the management, control and governance of the "property, finances and affairs" of the County, including the County Jail. N.J.S.A. 40:20–1.

2. In March 1978, defendants moved for dismissal of the complaint or, in the alternative, for summary judgment. Defendants contended that this Court had no jurisdiction over the matter, that the doctrine of abstention was applicable, and that the complaint failed to state a claim upon which relief could be grant-

ed. They further maintained that, because they had complied with December 1977 recommendations submitted by the New Jersey Department of Corrections as well as several suggestions made by the Public Advocate, the allegations of the complaint were moot. In addition, the Board of Chosen Freeholders moved to dismiss on the grounds that they lacked control over and responsibility for the operation and maintenance of the jail. On April 24, 1978, after hearing argument, the Court denied defendants' motion in its entirety.

class as certified by the Court on April 28, 1978, pursuant to F.R.Civ.P. 23(b)(2) consists of all persons incarcerated as of the date of class certification and all future inmates of the Passaic County Jail.[3]

On May 31, 1978, plaintiffs filed an amended complaint. Dividing their allegations into 10 categories,[4] plaintiffs complain, *inter alia*, of overcrowding; inadequate classification systems; unsanitary living conditions; inadequate medical care; insufficient opportunity for exercise; insufficient and nutritionally deficient food; overly limited restrictions on telephone use and visitation; inadequate disciplinary procedures; inadequate provisions for inmates not literate in English; and overly restrictive access to the courts, to reading material, and to religious worship.

The complaint also alleges sex discrimination. It is alleged that women are not permitted to attend services in the jail chapel and are deprived of other opportunities for religious worship furnished male inmates. Routine sick call is available for women only once a week; it is provided to men five days a week. Female inmates are permitted to use the institution's gym for only two hours a week, while male prisoners may use it three hours each week. Moreover, the only exercise equipment in the gym—a machine involving the use of weights—is not geared for use by females.

The alleged difference in allotted gym time affects more than merely the amount of exercise the inmates receive because the jail's "law library" is located in the gym, as are the only newspapers and magazines to which the inmates have access.

Newspapers and magazines were not allowed in the inmate housing areas. One copy of each day's local newspaper, The Paterson News, and occasionally other newspapers, were retained for one week in the gym and were available to inmates during, but only during, their recreation time. Thus, inmates had the opportunity to read newspapers and magazines for a possible maximum of three hours per week, an opportunity which they had to forsake if they wished to exercise.

The complaint further alleges that the following conditions exist at the Passaic County Jail. The institution is racially segregated and violent inmates are housed with the nonviolent and convicted inmates with the unconvicted. Inmates sleep on dirty mattresses in housing areas that are filthy and vermin infested. Ventilation is poor. Heating in winter months is often insufficient and hot water is frequently unavailable. When an inmate must have his teeth extracted, he is often unable to eat because he is given no dentures or other means of chewing food. Inmates who cannot afford their own underwear must go without. Not only do plumbing fixtures

---

Thereafter, on May 4, 1978, defendants filed a Third-Party Complaint against the Treasurer of the State of New Jersey, the Acting Commissioner of the New Jersey Department of Corrections, and the Superintendents of five New Jersey State Correctional facilities, alleging that the problems raised in the class action complaint resulted from overcrowding in the Passaic County Jail caused by third-party defendants' refusal to timely accept the transfer of convicted inmates as dictated by N.J.S.A. 2A:164–18 and N.J.S.A. 30:4–6. A stipulation dismissing this third-party complaint was filed on October 13, 1978.

**3.** Although most or all of the named plaintiffs have been transferred or released from the Passaic County Jail, "[t]his case belongs . . . to that narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Gerstein v. Pugh*, 420 U.S.

103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975). A live controversy existed between the named plaintiffs and the defendants both at the time suit was filed and at the time the class was certified by this Court, and that controversy remains alive today between members of the class and the defendants. Moreover, the issues presented here are " 'capable of repetition yet evading review.' " *Sosna v. Iowa*, 419 U.S. 393, 399–400, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975). *See, Bell v. Wolfish*, —— U.S. ——, —— n. 5, 99 S.ct. 1861, 60 L.Ed.2d 447 (1979).

**4.** The ten general categories are: Housing and Classification, Health and Sanitation, Medical Care, Physical Exercise, Food, Communication, Disciplinary Procedures, Access to Courts, Reading Material, and Religious Freedom.

operate defectively, but, if guards are unavailable or unwilling to be of assistance during the day, many inmates cannot reach toilet facilities and are forced to urinate in shower stalls. In addition, toilets are located close to and in open view of the inmate eating areas.

This condition was further explicated during a colloquy between the Court, defense counsel, and the Warden of the Passaic County Jail.

THE COURT: Is it really true they had open toilets where the prisoners ate in the dining room?

.    .    .    .    .

MR. KOPF: They did and do.

.    .    .    .    .

THE COURT: You mean you could see them sitting there on a toilet?

MR. KOPF: Yes, but we are remedying that situation, your Honor. We're putting in partitions.

THE COURT: You mean it still exists right now?

MR. KOPF: Yes, your Honor.

.    .    .    .    .

THE COURT: . . . How long has that been going on, counsel?

MR. KOPF: I imagine since the jail was constructed.

.    .    .    .    .

THE COURT: What is the area we are talking about?

MR. KOPF: We are talking about the day room.

.    .    .    .    .

THE COURT: And that's where the prisoners eat?

MR. KOPF: Yes.

THE COURT: How many eat there at one time? Do you know?

.    .    .    .    .

THE WARDEN: Fourteen at two tables.

THE COURT: Now, you say there are open toilets there?

MR. KOPF: Yes.

.    .    .    .    .

THE WARDEN: Wall-hung toilets. Flushable toilets. All the jails are built that way. The toilets are built up against the room. Corrections for years have built rooms—they have built day rooms. In the day rooms they would have two toilets and two sinks. They would have tables for them to sit and eat at. The cells are in the back. Each one of those have a toilet. During the day they are out in the day room, playing the cards. They go over to the bathroom. There is no lid on the toilet. The toilets aren't built with lids.

THE COURT: Does somebody go to the bathroom while somebody is eating there? Is that right?

THE WARDEN: They could.

THE COURT: If somebody has to go to the bathroom—

THE WARDEN: They would.

THE COURT: —they'd do that, wouldn't they?

THE WARDEN: That's right.

THE COURT: I see. . . .

THE WARDEN: It is not a dining room.

THE COURT: Do the prisoners have any place else to eat?

THE WARDEN: No.

(Tr. 275–278).

### B. The Settlement

In February 1979, the parties reported that a settlement had been reached as to all issues except two: visiting practices and the rights of inmates to have newspapers and magazines in their cells. Thereafter, on March 6, 1979, the question of inmate access to reading materials was also settled.[5] Accordingly, on April 10, 1979, after

---

5. This agreement, which became part of the overall settlement of the case, provides that an inmate may "purchase one copy of any newspaper generally available in Paterson, New Jersey" each day through the jail commissary and may keep it in his cell as long as he has no more than one newspaper in his possession at a time. Each inmate may also obtain magazines generally available in Paterson and may keep two in his cell. The periodicals will be routed

fulfillment of notice and hearing requirements, this Court approved the proposed settlement.[6] The Stipulation of Settlement and Consent Order indicates that defendants instituted many changes in the jail during the pendency of the litigation. The settlement requires that the defendants take various actions to ensure the cleanliness and suitability of the inmates' living areas, clothing and food, and to improve medical-dental care. Women will be given equal access to facilities and services. The disciplinary procedures will be improved, as will access to law books and attorneys. Inmates will be assured of access to toilet facilities and those facilities will be screened from the view of other inmates. In sum, the settlement agreement provides for a vast improvement in the living conditions and treatment of Passaic County Jail inmates.

## II. Visitation

The only issue remaining before the Court is the amount, duration and nature of visitation to which the inmates are constitutionally entitled. Plaintiffs challenge virtually every aspect of the visitation system at the Passaic County Jail. They complain of limitations on the number of visitors allowed, the amount of time allotted per visitor, and the number of days on which visiting is permitted. In addition, they contend that they have a federally guaranteed right to "contact visits," a right which they are currently denied.

Visitation at the Passaic County Jail is extremely limited.[7] All visits, except those involving attorneys and clergymen, are "non-contact": they take place in booths in which the inmate and his visitor stand facing each other, physically separated by a glass panel. All conversation is conducted over telephones. Each inmate is allowed two adult visitors a week for a maximum of 30 minutes visitation time per week. He may see the visitors simultaneously for 30 minutes or separately for 15 minutes each.[8]

Generally, male inmates receive visitors on Saturdays from 12:30–2:30 P.M.; female inmates and sentenced males receive visitors on Sundays from 9:00–10:30 A.M. Special visits, at other than the regularly scheduled hours, are occasionally permitted when requested by an inmate or visitor and authorized by the Sheriff or Warden. Such visits also take place in the visiting booths. An inmate who has special visitors during the week loses his visiting privileges on the following weekend. *No children under 18 years of age are allowed to visit inmates at any time except with the Sheriff's or Warden's permission, which is given only in extraordinary circumstances, such as if the child's only other living parent dies.*

Defendants concede that visiting hours are inadequate (Defendants' Proposed Findings of Fact, # 1). However, they contend that the remaining restrictions are necessary to preserve the security of the jail and the safety of the inmates. Specifically, they argue that contact visitation will result in an unacceptable level of contraband—both weapons and drugs—entering the jail. Defendants point to the design of the jail which requires all visitors to enter the security perimeter of the institution, thus presenting an automatic threat to security. They maintain that implementation of extra security measures, such as strip searches of inmates following contact visits,

through the jail library system. When an inmate desires to read different magazines, he can exchange those he possesses for new ones. In addition, inmates may retain in their cells a small number of clippings from the newspapers and magazines. Any inmate who abuses the system may be denied the right to receive this reading material. (Consent Order, filed March 9, 1979).

**6.** Class members filed no objections to the settlement; nor did any class members or their attorneys appear at the settlement hearing.

**7.** Defendants maintained in their pretrial brief that visiting privileges will be expanded when the planned new floor is added to the jail. The architectural plans call for additional non-contact visiting areas. However, funding for the addition has not yet been obtained for the construction and the Court will decide the issues before it based on the existing structure.

**8.** There was some testimony that visits may be shorter or longer at the whim of the guards.

would require increased expenditures for equipment and personnel, and would not sufficiently prevent the entry of contraband into the facility. They further contend that there is more privacy for inmates and visitors under the current non-contact visitation system than there would be if contact visitation were implemented. Defendants assert that for this reason, as well as the increased searches which would be required, many inmates do not want contact visitation. In addition, defendants contend that Bail and Pretrial Release Programs in the State of New Jersey result in the pretrial incarceration of only those individuals who are a danger to themselves or to society, or who constitute high security risks, so that even if contact visitation were available, the institution could reasonably deny it to pretrial detainees. This consideration, defendants note, is buttressed by the relatively short period of time during which these inmates are incarcerated, which prevents jail authorities from adequately ascertaining the traits of inmates and the identity of their visitors. Finally, with respect to the absolute ban on visitation by children which effectively separates every parent in the institution from his minor children for the entire duration of the parents' incarceration, the Sheriff contends the rule is necessary in order for him to fulfill his duty to protect the "best interests" of the children.

The Supreme Court's very recent decision in *Bell v. Wolfish*, —— U.S. ——, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), decided while this matter was *sub judice*, addresses the rights of pretrial detainees and sets forth the standard that must be applied to the issues at bar.[9] Reversing a decision of the Court of Appeals for the Second Circuit which had held that restrictions placed on pretrial detainees must be justified by the "compelling necessities of jail administration," *Wolfish v. Levi*, 573 F.2d 118, 124 (2nd Cir. 1978), the Supreme Court resolved a conflict among the Circuits[10] and held that:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention . . . we think that the proper inquiry is whether those conditions amount to punishment of the detainee.
>
> .    .    .    .    .
>
> . . . Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "[w]hether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." [Citation omitted.] Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell v. Wolfish, supra,* —— U.S. at —— ——, 99 S.Ct. at 1873–4 (footnotes omitted).

*Wolfish* also makes clear that the government's legitimate objectives are not limited to ensuring a detainee's presence at trial. The Government also has legitimate interests that stem from its need to man-

---

9. Prior to the Supreme Court's decision, the applicable law in this Circuit was set forth in *Norris v. Frame,* 585 F.2d 1183 (3rd Cir. 1978). In that case, the Court of Appeals for the Third Circuit stated that deprivations imposed on pretrial detainees must be justified by "a showing of a substantial relationship" to legitimate prison interests. (*Id.* at 1188, n.15). To the extent that this test differs from that set forth by the Supreme Court in *Bell v. Wolfish,* we are no longer bound by it.

10. *See, e. g., Feeley v. Sampson,* 570 F.2d 364 (1st Cir. 1978); *Wolfish v. Levi,* 573 F.2d 118 (2nd Cir. 1978); *Norris v. Frame,* 585 F.2d 1183 (3rd Cir. 1978); *Patterson v. Morrisette,* 564 F.2d 1109 (4th Cir. 1977); *Miller v. Carson,* 563 F.2d 741 (5th Cir. 1977); *Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976); and *Campbell v. McGruder,* 188 U.S.App.D.C. 258, 580 F.2d 521 (1978).

age the facility in which the individual is detained. These legitimate operational concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial. For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees. Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.

*Id.,* at ———, 99 S.Ct. at 1874 (footnotes omitted).

Finally, *Wolfish* emphasizes that courts must defer to the expertise of corrections officials:

> In determining whether restrictions or conditions are reasonably related to the government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to those considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.,* at ——–——, n.23, 99 S.Ct. at 1875. Indeed, the Supreme Court makes it crystal clear that courts must give "substantial deference", *Id.,* at ———, n.29, 99 S.Ct. 1861, to the judgment of prison officials. No less than 12 times [11] in its opinion the Court reminds us that it is not the business of

federal district judges to run correctional institutions or county jails:

> . . . the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

*Id.,* at ———, 99 S.Ct. at 1886. Thus, this Court *must* defer to the informed discretion of the Passaic County corrections officials unless there is "substantial evidence in the record" to indicate that such deference is improvident.

Plaintiffs challenge almost every aspect of the visitation system at the Passaic County Jail. Under the Supreme Court's standard, their burden is a heavy one. To prevail, plaintiffs must overcome the presumption of regularity which attaches to the decisions of the jail authorities and satisfy the Court that each visitation restriction is not "reasonably related to a legitimate goal" of the Passaic County Jail.[12] If plaintiffs do not present substantial evidence that a particular limitation on a prisoner's action is arbitrary or is otherwise an exaggerated response to a legitimate goal of the institution, the Court must defer to the jail officials' expertise.

The Court's task is not an easy one. While deferring to the jail administration, the Court must still ensure that the administration's response to problems is "reasonable". The Court must be especially alert when the alleged justification for an administration decision is institutional security, because literally any restraint could be justified on the ground of increased security. A naked man in chains in a bare cell poses

---

11. —— U.S. at ———, ———, n.23, ———, —— and nn. 29 and 30; —— and n.32, ———, ———, n.38, and ———, 99 S.Ct. 1861.

12. It is evident that there is no *expressed* intent to punish here. Defendants have consistently contended that the visitation conditions are necessary to maintain jail security and order

and to preserve the safety and health of the inmates. Plaintiffs have never *argued* that it is defendants' *intent* to punish the detainees.

Moreover, because punishment is not the justification for the visitation conditions, we need not distinguish between the visitation rights to be accorded pretrial and post-trial inmates.

no risk. From that point on, every increase in freedom brings at least some decrease in security. Every decision in a prison environment involves the weighing of lesser or greater restraint against the increased or diminished chances of contraband or escape. While the Court may not substitute its judgment as to the proper balance of these factors, it must be satisfied that the balance struck by jail authorities is reasonable. The ambit of the administrators' discretion and judgment may be wide—but it is not unbounded. The Court is not to usurp the role of the jailer. But it cannot abandon its role as a proper forum for adjudication of the rights of prisoners. The final judgment as to what is reasonable or not lies here. Whether a particular restriction is reasonably related to the security or other legitimate objective of a jail facility depends upon the aim of the restriction, given the situation faced by the administration of the particular institution, and the magnitude of the restriction as weighed against the desirability of the goal. It is almost impossible to decide that issue removed from the actual conditions of the particular jail house.

Both plaintiffs and defendants presented expert testimony from individuals with long experience in prison administration—individuals who publish and teach in the corrections area and who have served as consultants in the establishment and overhaul of jail facilities. These individuals visited the Passaic County Jail and studied the institution's architectural plans. The Court also heard testimony from other corrections officers in New Jersey who, at the Court's request, examined the architectural plans. In addition, the Court heard from present and former inmates of the jail and a former inmate's mother, all of whom participated in the visitation program.[13]

As discussed below, the record is sufficiently complete to allow the Court to reach certain preliminary conclusions concerning the visitation practices at the Passaic County Jail. Other aspects, however, must await the report of a Special Master, the need for whom is agreed upon by all parties.

Based on the applicable law and the evidence adduced at trial, the Court finds unconstitutional the ban imposed by the defendants on visitation by children. The Court finds that this prohibition is not reasonably related to any legitimate goal of the Passaic County Jail. It represents the judgment of the jailer that it is not in the best interests of the children to visit their parents while those parents are in jail:

> THE COURT: So . . . your two reasons are [that] the children can be captured, the number one reason. And the number two reason, it's bad for children to see fathers and mothers in jail. Is that it?

13. The parties also introduced into evidence excerpts from the following publications: National Sheriff's Association, Inmates Legal Rights (1974); American Correctional Association, Manual of Standards for Adult Local Detention Facilities; U. S. Department of Justice, Draft Federal Standards for Corrections. The Court will, of course, take these materials into consideration. However, "while the recommendations of these various groups may be instructive . . ., they simply do not establish the constitutional minima; rather they establish goals recommended by the organization in question." *Bell v. Wolfish, supra,* at ——, n. 27, 99 S.Ct. at 1876.

Similarly, evidence on the practices and procedures for contact visits in other detention facilities, both in New Jersey and in other parts of the country, while instructive on alternative visitation systems, do not address the question presently before the Court, *i. e.,* whether the existing visiting practices at the Passaic County Jail are reasonable under the circumstances facing its administration. Such documents might be more relevant if the Court were to accept plaintiffs' argument that, because contact visitation is available in all but one New Jersey State prison as well as in some county jails in the state, contact visitation must be implemented in the Passaic County Jail as a matter of equal protection. It is clear, however, that an "equal protection" argument has no place in a case involving prison administration unless the comparison institutions are run by a common authority. Such an argument would bind all prison officials to the decision made by the most liberal among them. "Certainly the Due Process Clause does not mandate a 'lowest common denominator' security standard, whereby a practice permitted at one penal institution must be permitted at all institutions." *Wolfish, supra,* at ——, 99 S.Ct. at 1882.

MR. KOPF: Yes. (Tr. 162).

It simply does not lie with jail officials to determine what is in the best interests of the inmates' children.[14] The jail officials here have taken it upon themselves to deny all these individuals who are incarcerated— for whatever reason—and their children one of the most fundamental of all human rights. The rule forbidding incarcerated parents from seeing their children is not only arbitrary, it is an exaggerated response to a concern which does not properly rest with the jail authorities.

At the conclusion of the first day of testimony, the Court informed the parties that it was considering the issuance of a temporary restraining order or a preliminary injunction requiring defendants to immediately permit children to visit their parents in the jail. By the following morning, the parties reached an agreement providing for interim relief pending a final decision on the issue by the Court and a consent order was entered.[15] The order is not final, however, and it provides for modification by the Court. Thus, the nature and extent of children's visits to their parents in the jail must still be finally determined by this Court.

## III. Appointment of a Special Master

### A. Period of Visitation

With respect to the other aspects of the visitation system, the testimony of witnesses for both parties established, and the Court finds, that the present allowance of a maximum of half-an-hour of visitation time per inmate per week may be constitutionally inadequate. Both plaintiffs and defendants concede that the inmates have a clear constitutional right to the maximum number of visits for the maximum length of time practicable and, depending on the circumstances here, it is evident that visitation time may have to be greatly expanded. The Court presently does not, however, have sufficient information to determine what would be the appropriate frequency or length of visits.

### B. Contact Visits

The Court finds that there is sufficient evidence in the record to merit further inquiry into the question of the reasonableness of defendants' decision to deny plaintiffs all contact visitation.

The testimony established the following facts with respect to visitation. The Passaic County Jail is poorly designed for most of the purposes which it is intended to serve and is ill-suited even for the present visitation system. (Tr. 365, Deland; Tr. 376, Lund). Visitors must enter the security perimeter of the jail and pass close to inmate housing areas and through corridors used by inmates during non-visitation hours, placing a major burden on jail security. There is no doubt that the implementation of contact visits at the Passaic County Jail may increase the risk of the introduction of contraband into the jail. (Tr. 273, Case; Tr. 134, Early). Drugs and other contraband enter the facility even under the present visitation conditions,[16] and it may very well be possible to minimize any increased risk due to contact visitation by the effective use of security measures, including searches of visitors, inmates and the visiting area itself. (Tr. 133, et seq., Early; Tr. 176, et seq., Keenan; Tr. 236, et seq.,

14. Administrators of penal institutions within the State of New Jersey are charged with separating juvenile offenders under age 18 from adult offenders. N.J.S.A. 30:8–7, 8–8. This law, however, relates solely to minors incarcerated in such institutions; it is not directed at visitors.

15. The consent order provided that children may visit their parents in the jail on Monday and Tuesday evenings from 7:00–9:00 P.M. The visits will be non-contact and the defendants will divide the jail population so that each inmate who wishes to see his children can receive at least one visit a week for at least one-half hour. Children are still prohibited from visiting the jail during the weekend. (Consent Order, filed March 22, 1979).

16. (Tr. 110, et seq., Brown; Tr. 434, Cunningham). As one former inmate testified, "Where there's a will, there's a way." (Tr. 110, Brown).

Case; Tr. 323, *et seq.* Deland).[17] Thus, the ultimate question before the Court is whether, given the security problems faced by the Passaic County Jail authorities with any visitation system, there is a reasonable basis for the decision to limit Passaic County Jail inmates to non-contact visitation.

Unfortunately, the testimony did not furnish all the information which the Court needs in order to determine whether jail authorities have exercised their discretion in a reasonable manner; that is,—to the extent that it can be estimated—precisely *how much* of a diminution in security or increase in the introduction of contraband will occur if contact visitation is implemented. The Court must have this information in order to determine whether the denial of contact visits is a legitimate response to realistic fears of security problems.

Nor can the Court determine from the information presently before it whether the jail has sufficient space in which to hold contact visits. There was a great deal of testimony about the possibility of using the jail's chapel for contact visits, but all those questioned about this possibility agreed that certain structural changes would have to be made in the chapel itself and in the corridors leading to the chapel before contact visitation could be implemented. Testimony concerning these needed changes was insufficiently detailed for the Court to determine whether using the chapel for visitation is practicable. The issue of contact visits, like the appropriate length and frequency of visitation periods, simply cannot be properly addressed in the vacuum in which the Court currently finds itself.[18]

It is clear that a thorough inquiry into the conditions at the Passaic County Jail must be conducted. The Court needs to know, for example, the number of guards and their actual and potential duties; the size of the areas in which contact visitation could take place; what those areas are currently used for and what furniture they contain; the width of the relevant jail corridors through which visitors do or might have to pass, what they contain and their present traffic flow; the amount of extra personnel that would be necessary if contact visitation is implemented or if non-contact visitation is increased. These are just a few of the many practical considerations with which the Court must be familiar to determine the reasonableness of the defendants' decisions.

Accordingly, the Court will appoint a Special Master to undertake a thorough examination of the conditions at the Passaic County Jail. This has been done by other courts in similar situations, *see, e. g., Owens-El v. Robinson,* 442 F.Supp. 1368 (W.D. Pa.), *modified,* 457 F.Supp. 984 (W.D.Pa. 1978), *appeal dismissed,* No. 78–1893 (3rd Cir. Sept. 6, 1978); *Jordan v. Wolke,* 75 F.R.D. 696 (E.D.Wis.1977); and *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977), and is appropriate here. The Master will have the authority and the responsibility to become familiar with all aspects of the Passaic County Jail. He will have complete access to all staff, records, and inmates. He will present to the Court his proposed findings of fact and his conclusions as to what the jail *reasonably* can do now, and in the future, to provide the maximum number of visits for the maximum length of time with the maximum degree of privacy

---

17. *One inmate testified on behalf of the defendants that he would not desire contact visits with his wife or children even if the opportunity existed because he objects to the extra searches and the increased presence of the guards which would be a necessary concomitant of contact visits.* The issue before the Court, however, is not whether certain inmates would prefer contact visits, but whether the Constitution requires the opportunity for such visits.

18. This problem is aggravated by defendants' decision not to have the Sheriff and the Warden testify on the present conditions at the jail. Although it is unlikely that their testimony would have solved the Court's predicament, it would have been helpful to hear from the two individuals most familiar with the jail.

We disagree with plaintiffs, however, that the expertise of these men is at issue. The test is not whether those who run the jail are experts in jail administration, but whether they have acted in an arbitrary and capricious manner.

for the maximum number of visitors, including children. In addition, as already consented to by the parties, the Master will supervise the implementation of the consent order. The full scope of the Master's powers and duties are set forth in the Court's Order of Reference. The Master's fee and expenses will be taxed as costs of suit against the defendants in their official capacities. F.R.Civ.P. 53(a). *See, e. g., Palmigiano v. Garrahy*, 443 F.Supp. 956, 990 (D.R.I.1977); *Morgan v. Kerrigan*, 530 F.2d 401, 427 (1st Cir.), *cert. denied sub nom., Boston Home and School Assn. v. Morgan*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976).

## ORDER

Pursuant to Rule 53(b) of the Federal Rules of Civil Procedure,

It is on this 8 day of July, 1979,

ORDERED that this case is hereby referred to Edward J. Dauber, Esquire, as Special Master; and it is further

ORDERED that the Special Master shall conduct a thorough examination into the conditions at the Passaic County Jail, in accordance with the guidelines set forth below and in this Court's Opinion of July 18, 1979, and shall submit to the Court his proposed findings of fact and conclusions of law as to the nature and the maximum amount of visitation which the jail authorities can reasonably provide the inmates in light of legitimate security considerations; and it is further

ORDERED that the Special Master shall have the additional duty to monitor compliance with and implementation of the Stipulation of Settlement and Consent Order entered by this Court on April 10, 1979; and it is further

ORDERED that, in order to enable the Special Master to carry out his duties, he shall have the following powers and authority:

1) The Special Master is authorized to select and hire, with prior approval of the Court, such assistant(s) as may be required to assist him in performing his duties. With prior approval of this Court, the Special Master may also consult appropriate, independent specialists.

2) The Special Master shall have unlimited access to the premises of the county jail at any time and no advance notice of his appearance shall be necessary.

3) The Special Master shall have unlimited access at reasonable times to all files and records relating to the Passaic County Jail. No advance notice of his intent to examine the records is necessary.

4) The Special Master shall be authorized to conduct confidential interviews at any reasonable time with any staff member or inmate, and shall have the right to attend any institutional meeting or proceeding without advance notice of his intention to appear.

5) The Special Master shall be empowered to hold hearings and to call witnesses, including both inmates and staff of the Passaic County Jail.

6) The Special Master may require written reports from any staff members or employees of the Passaic County Jail with respect to compliance with and implementation of this Court's Orders.

7) The Special Master shall be empowered to recommend to the Court that any staff member or employee of the Passaic County Jail be moved or transferred as he deems necessary to obtain compliance with and implementation of this Court's Orders. In the event that hiring of additional personnel or the termination of any current personnel is necessary to carry out or to prevent interference with the Court's Order, the Special Master shall file a written report with the Court explaining why such action is necessary. Defendants may file a written response to the report within ten (10) days thereafter and the Court shall then approve or reject the recommendation of the Special Master.

8) The Special Master shall have the authority to seek orders from the Court to show cause why the defendants, or any of their agents, employees, or persons acting in concert with them, should not be held in

contempt for failure to comply with his instructions or orders, or the Orders of this Court.

It is FURTHER ORDERED that the defendants shall post notices throughout the Passaic County Jail stating that the Court has appointed a Special Master, who may from time to time visit the jail, and talk to the staff members or inmates. The notice shall emphasize that the Special Master's only function is to aid the Court in its determination of the reasonableness of the visitation practices at the jail and of the defendants' compliance with the Court's Order of April 10, 1979; that his appointment is not to be considered as providing any substitute for, or addition to, the regular grievance and disciplinary procedures of the jail; that he is not to investigate, to arbitrate, or to interfere with the disposition of the grievances or complaints of individual inmates or staff members; that if the Special Master desires any information from either inmates or staff with respect to such matters, he will initiate the matter; and that if any person, inmate or staff member desires to bring any matter to the attention of the Special Master, he or she may do so only by making the desire known to counsel for the parties, who will then decide whether or not to bring the matter to the attention of the Special Master. The notices to be posted throughout the Passaic County Jail shall state the name and address of counsel for plaintiffs and counsel for defendants. The notices shall remain posted until the Special Master has been discharged. The form of the notices shall be drafted by counsel and fixed by the Special Master; and it is further

ORDERED that not later than 120 days after his appointment, the Special Master shall file his proposed findings of fact and conclusions of law as to what visitation procedures the Passaic County Jail may reasonably institute. The report shall separately address the following issues:

1) Whether the Passaic County Jail may reasonably deny inmates contact visitation;

2) What is the maximum number of visits for the maximum length of time with the maximum degree of privacy for the maximum number of visitors which the jail can reasonably provide the inmates; and

3) Whether there is a reasonable need to make special provisions for visits by inmates' children or whether they may reasonably be treated the same as adult visitors.

With respect to each issue, the Special Master shall, if appropriate, set forth a proposed timetable for the institution of any changes which he suggests.

The parties shall have twenty (20) days after the Special Master submits his report to file a written response with the Court if they so desire; and it is further

ORDERED that not later than ninety (90) days after his appointment, the Special Master shall file his first report evaluating the defendants' compliance with this Court's Order of April 10, 1979. As to each item of the Stipulation of Settlement and Consent Order, the report should show:

1) the state of compliance; and

2) the evidentiary basis for the Special Master's conclusion, whether observation, interview, hearing or other means; and it is further

ORDERED that after the filing of the initial report on defendants' compliance with the Court's Order, the Special Master shall file reports not less often than every one hundred and twenty (120) days, until he finds that the defendants have fully complied with the Court's Order of April 10, 1979, and that such compliance has continued for a sufficient length of time to make a lapse into noncompliance improbable. At that time, the Special Master may recommend his discharge; and it is further

ORDERED that pursuant to Rule 53, Federal Rules of Civil Procedure, the Special Master shall be allowed his necessary expenses and a fee of $85.00 per hour for his services in carrying out his duties, which shall be taxed as part of the costs of this matter and assessed against the defendants in their official capacities. The Special Master shall keep a record of the time spent

in connection with his duties, which he shall submit to the defendants every sixty (60) days for processing and payment. And it is further

ORDERED that the Court will retain jurisdiction over the parties and of this cause of action.