James O'BRYAN, et al., Plaintiffs,

v.

The COUNTY OF SAGINAW, MICHIGAN, et al., Defendants.

Civ. No. 75–10075.

United States District Court,
E. D. Michigan, N. D.

Dec. 8, 1981.

Steven Winter and Joel Berger, New York City, for NAACP Legal Defense Fund.

Alan S. Ells, Legal Services of Eastern Michigan, Flint, Mich., for plaintiffs.

David Meyer, Peter C. Jensen, Saginaw, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

## I. INTRODUCTION

### A. *Procedural History*

In 1975, plaintiffs brought this action on behalf of themselves and all others similarly situated challenging the constitutionality of certain practices and procedures affecting inmates at the Saginaw County Jail. In *O'Bryan v. County of Saginaw*, 437 F.Supp. 582 (E.D.Mich., 1977) (hereinafter *"O'Bryan I"*), the Court concluded that plaintiffs' constitutional rights had been violated. In *O'Bryan v. County of Saginaw*, 446 F.Supp. 436 (E.D.Mich., 1978) (hereinafter *"O'Bryan II"*), the Court entered a Final Judgment and Permanent Injunction requiring the implementation of various procedures and programs in the Saginaw County Jail (hereinafter "jail").

Defendants appealed certain portions of the case. While the appeal was pending, defendants filed a petition for modification of particular aspects of *O'Bryan II* so as to bring about desired changes after having implemented the injunction for a substantial period of time. On April 10, 1980, 620 F.2d 303, the United States Court of Appeals for the Sixth Circuit remanded the case to this Court on plaintiffs-appellees' motion for further proceedings in light of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

On January 14, 1981, the Court issued a Memorandum Opinion and Order granting defendants' petition for modification in substantial measure. The modifications were not based on *Wolfish* but rather on practical considerations attending the orders in *O'Bryan I and II*. On February 27, 1981, the Court issued a second Memorandum Opinion and Order denying both defendants' motion to dismiss and/or vacate *O'Bryan II* and plaintiffs' conditional motion for modification of the final judgment. The Court, however, did grant plaintiffs' motion for reconsideration on remand of the contact visitation and receipt of publication issues and plaintiffs' motion for reconsideration of the medical aspects of the Court's opinion of January 14, 1981. A consent decree was entered by the Court on the receipt of publications and medical treatment issues on May 19, 1981.

Thus, the sole issue now before the Court is the impact of *Wolfish* on the Court's

resolution in *O'Bryan I and II* of the visitation question. In 1977 and 1978, the controlling law required the application of the "least restrictive means" test. *Jones v. Wittenberg*, 323 F.Supp. 93, 99 and 330 F.Supp. 707 (N.D.Ohio, 1971), *aff'd sub nom. Jones v. Metzger*, 456 F.2d 854 (CA 6, 1972). It was applied in *O'Bryan I* and served as the basis for *O'Bryan II*. When applied, that test placed the "burden of justification" on the state to show a compelling necessity for the curtailment or restraint of a pretrial detainee's personal liberty beyond that absolutely necessary for security reasons and/or the assurance of a pretrial detainee's presence at trial. *O'Bryan I*, 437 F.Supp. at 595. Based on this test, the Court held that contact visitation was constitutionally required. *O'Bryan I*, 437 F.Supp. at 598–599; *O'Bryan II*, 446 F.Supp. at 441.

While the parties disagree as to the impact of *Wolfish* on the issue of contact visitation, they do agree that as a result of it, the "least restrictive means" test is no longer applicable. Supplementation of an already exhaustive record was therefore allowed for the purpose of focusing on the legal and factual considerations expressed in *Wolfish*. In order to afford the parties an opportunity to construct their arguments, the Court framed the issue generally, to wit: "whether contact visitation is constitutionally required for pretrial detainees at the Saginaw County Jail under *Bell v. Wolfish.*"

Commencing on May 18, 1981, the Court held three days of trial. During that time, it heard the testimony of nine witnesses and admitted five exhibits into evidence. Pursuant to F.R.Civ.P. 52(a), the Court hereby enters its supplemental findings of fact and revised conclusions of law. To facilitate review, the Court initially sets forth its understanding of the standard of review in light of *Wolfish*. Then, it enters its supplemental findings of fact and re-

vised conclusions of law. As a point of procedure, the Court hereby incorporates into its revised conclusions of law, the following introductory analysis of *Wolfish*.

### B. The Standard of Review in Light of Bell v. Wolfish

1. While "there is no iron curtain drawn between the Constitution and prisons of this country," *Wolff v. McDonnell*, 418 U.S. 539, 555–556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

■ 2. When a condition or practice within a prison becomes the subject of legal action, the breadth of judicial inquiry and the resolution of the issue itself are limited to what a constitutional minimum requires in the situation. *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979).[1] A pretrial detainee is protected by the Due Process Clause. *Id.* at 535, 99 S.Ct. at 1872.

3. In gauging a particular prison condition or practice against the requirements of due process, the Court must initially ascertain the nature of the claimed constitutional violation so it can determine the proper mode of analysis. If the contested condition or practice implicates only the general constitutional protection against the deprivation of liberty without due process of law, then the "proper inquiry is whether those conditions amount to punishment of the detainee." *Wolfish, supra,* at 535, 99 S.Ct. at 1872. If the contested condition or practice implicates an express constitutional right, then the Court must also inquire whether the condition or practice violates those legal precepts inherent in

---

1. The term "prison" is used in the generic sense and is only meant to refer to a facility which houses, among others, pretrial detainees.

The term "inmate" is also used in the generic sense and is only meant to refer to an individual who is housed in such an institution.

that constitutional right as they may apply in a prison environment.[2]

■ 4. In determining whether a particular restriction or condition accompanying pretrial detention amounts to "punishment" in the constitutional sense of the word:

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal,— if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. *Wolfish, supra* at 538–539, 99 S.Ct. 1873–1874 (citations omitted). *See also Id.* at 539, n. 20, 99 S.Ct. at 1874, n.20.

■ 5. In prison matters, the plaintiffs' burden of proof is "heavy," *Wolfish, supra* at 561, 99 S.Ct. at 1885, because "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 540, n. 23, 99 S.Ct. at 1875, n.23, quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

## II. SUPPLEMENTAL FINDINGS OF FACT

1.) The defendants have complied fully with *O'Bryan I and II.*

2.) Contact visitation is a categorical term which ideally refers to a meeting within a jail wherein a visitor(s) and inmate may converse without being separated by some form of physical barrier and briefly touch, embrace and/or kiss one another.

3.) Contact visitation is emotionally and socially constructive. Other benefits of contact visitation are, among many, that it (a) reflects a common manner of visitation; (b) assures audible communication; (c) enhances the message being communicated; (d) is preferred by inmates and visitors over other forms of visitation; and (e) tends to reduce inmate and visitor apprehension and tension.

4.) Contact visitation occurs on the main floor of the Law Enforcement Building in a room which adjoins the front main lobby of the Law Enforcement Building. The jail is located in the Law Enforcement Building.

5.) Before an actual visit at the jail, a visitor is required to place all hand-held belongings in a locker, but retains the key thereto. A frisk is thereafter conducted during which the visitor is also required to open his or her mouth and roll the tongue to prevent the transfer of drugs or contraband by mouth. Babies are also checked for similar reasons. Upon meeting and leaving, the inmate and visitor(s) may briefly touch, embrace or kiss one another. During the barrierless visit, they are required to keep their hands above the tables provided in the visiting area, and to sit across from each other rather than closely together. Children are not permitted to sit on the inmate's lap. After the visit, the inmate relinquishes the prison uniform worn during the visit and is then strip-searched and issued a new set of clothing.

**2.** *Wolfish, supra* at 550–552, 99 S.Ct. at 1880–1881 (publisher only rule for hardback books vis-a-vis the First Amendment); *Id.* at 555–557, 99 S.Ct. at 1882–1883 (unannounced room searches without inmates present vis-a-vis the Fourth Amendment); *Id.* at 558–559, 99 S.Ct. at 1884 (body cavity searches vis-a-vis the Fourth Amendment); and *Id.* at 560, 99 S.Ct. at 1885 (the aforementioned security practices did not constitute punishment, e.g. the Fifth Amendment).

6.) Contact visitation at the jail generally requires the services of six security guards; thus reducing the number of immediately-available officers during that period. To facilitate security during visitation in the contact area, mechanical devices are available and utilized. These at least include a metal detector and a sophisticated monitoring or surveillance apparatus.

7.) The inmate population at the jail has increased since *O'Bryan I* due to a variety of social and economic reasons. State judges, for example, are increasingly engaging in the program of "day parole" or "work release." Further, the commission of crimes has increased, resulting in more arrests and detentions. While the actual number of inmates at any given time appears seasonal, the jail is now averaging 195 to 200 inmates a day.

8.) The increase in the inmate population creates real security problems and legitimate security concerns. These problems and concerns are compounded by the program of contact visitation.

9.) Illicit drugs and contraband enter the jail, problems which both parties admit are illegal and pose a serious security dilemma. The extent of their admittance and the reasons therefore are in dispute. It is clear, however, that contact visitation is one of the situations occurring within the jail that creates and magnifies the problem.

10.) During contact visitation, there always exists the threat of a fight, argument or other form of violence between inmates, visitors or inmates and visitors. Since the contact visitation period necessitates the utilization of numerous resources of the Sheriff Department, that period presents a fertile time for breaches of security within the Law Enforcement Building and particularly the jail.

11.) The architectural structure of the Law Enforcement Building and the jail in and of itself limits the ability of the Sheriff Department to respond to a security problem during contact visitation. An illustration of the structural problems is that during contact visitation the Law Enforcement Building is literally cut in half for security reasons; thereby forcing an employee or visitor who needs to go from one side of the building to the other, to exit one door, walk around the outside of the building and enter through another door on the other side.

12.) The responsibilities of the Sheriff of Saginaw County and his employees are, among many: (a) maintaining and operating the jail, (b) taking citizen complaints, (c) investigating accidents and other reports, (d) recovering bodies, (e) investigating alleged vice and narcotics violations, (f) servicing subpoenas and other papers of the Court, (g) transporting inmates from 26 separate police agencies to the Courts, and (h) furnishing court officers for five district courts. The Sheriff Department currently employs 26 uniformed officers and 4 supervisors. Due to budgetary problems, contractual arrangements and statutory obligations, the Sheriff Department is afforded little flexibility in the manner in which it conducts its affairs.

13.) Although built in 1972, the Law Enforcement Building was not designed to accommodate the amount of people that enter the facility. Thus, the use of the facility for contact visitation limits access and interferes with use of the Law Enforcement Building by persons who are there for other law enforcement and governmental purposes, including, among many: (a) immigration and naturalization services, (b) applications for gun permits, (c) registration of concealed weapons, and (d) ingress and egress by other local, state and federal law enforcement agencies.

14.) Vandalism and other similar security-related incidents are recurring problems in and around the Law Enforcement Building. These problems are not a consequence of only contact visitation. Rather, they are a result of both the large influx of people who traverse the building and the dynamic nature of such a multipurpose building.

15.) Under the circumstances herein, confusion and/or a lack of control over the administration of the jail is a reality during contact visitation; thus causing real security problems and legitimate security con-

cerns in and around the Law Enforcement Building. A careful application of a form of barrier visitation would alleviate these problems and concerns.

16.) It is the policy of the Michigan Department of Corrections to promote a program of contact visitation because, among other reasons, it (a) lowers anxiety in the jail and (b) aids in keeping the inmate's contact with his or her family and friends.

17.) The manner of communication provided by the defendants for the purpose of visitation prior to 1977 and explained in *O'Bryan I* was so inadequate that it effectively precluded verbal discourse between inmate and visitor. Equally inadequate was the opportunity for a visitor and inmate to see one another. The defendants admit this and affirmatively state that if contact visitation is not constitutionally mandated that it would under no circumstances reinstitute the former system.[3]

18.) A form of barrier visitation which (a) permits reasonable privacy under the circumstances, (b) assures audible communication at a normal voice level or volume relatively unobstructed by surrounding noise and (c) provides an adequate and clear view of both inmate and visitor is a reasonable means of mutually accommodating the needs of the inmate and the jail.

## III. REVISED CONCLUSIONS OF LAW

1.) The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1343(3), 28 U.S.C. § 1331, and the Fourteenth Amendment of the United States Constitution. *O'Bryan I*, 437 F.Supp. at 594.

2.) While plaintiffs' position is presented in a two-fold manner, inherent in both arguments is the supposition that the Court must be mindful that visitation involves the basic relationship of the family. Plaintiffs' first argument is that the imposition of a barrier during visitation must fail under the "punishment" test explicated in *Wolfish*. Their second argument is that the imposition of a barrier during visitation "impermissibly interferes with the family rights protected by the Due Process Clause." This latter assertion is based on certain language in *Wolfish* and the proposition that the family unit involves a fundamental zone of privacy protected here by the Fourteenth Amendment. With regard to this aspect of their claim, plaintiffs contend that the more exacting scrutiny applied in *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974) should control.[4]

3.) The Court believes that it is important to realize at the outset that the narrow issue to be decided is whether a form of visitation, *contact* visitation, is constitutionally required for pretrial detainees at the jail. Although *Wolfish* does not directly address the issue of contact visitation, it does provide the conceptual framework necessary to reach a decision. In this case, the visitation practice at issue pertains solely to (a) touching, embracing or kissing and (b) conversing without a barrier in a prison. The visitation practice therefore implicates no express constitutional right. As a result, *Wolfish*, 441 U.S. at 535, 99 S.Ct. at 1872, requires *only* the application of the "punishment" test. *See, Jordan v. Wolke*, 615 F.2d 749 (CA 7, 1980).

---

**3.** Prior to *O'Bryan I*, only immediate family members over the age of 16 years were permitted to visit an inmate. Friends were permitted to visit only if the inmate had no family in the area. In either situation, only one visit per week for 15 minutes was allowed. Visits were conducted via a visiting booth at the end of the inmate's cell section. The visitor stood in the hall corridor. Between the visitor and inmate was a brick and glass partition, through which communication was conducted by phone. The phones were rarely, if ever, operable. *See, O'Bryan I*, 437 F.Supp. at 590–591.

**4.** In the context of a First Amendment issue, the Supreme Court stated the appropriate standard of review as follows:

First, the regulation or practice in question must further an important or substantial governmental interest... Second, the limitation ... must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974).

4.) Accordingly, there has been no evidence to show that the imposition of a barrier during visitation is a disability imposed for the purpose or with the expressed intent of punishing the pretrial detainees at the jail. In *O'Bryan I*, 437 F.Supp. at 593, the Court found "no evidence of malicious or intentionally wanton deprivation of any constitutional rights of inmates. Rather, defendants have attempted to show a genuine concern for such." No evidence has been adduced which might lead the Court to conclude then or now that the defendants have ever acted with the purpose or expressed intent to punish the pretrial detainees at the jail.

5.) There has been no persuasive evidence adduced to show that the imposition of a barrier during visitation is not reasonably related to a legitimate jail objective, e.g. the effectuation of a legal detention, the assurance of the detainee's presence at trial, the maintenance of internal security or the preservation of order—all notions commonly identified with the concept of appropriate prison administration. This conclusion also negates any permissible inference that the purpose of the jail action is for "punishment." The limited contrary testimony to this conclusion actually pertained to the most litigated question of whether the imposition of a barrier during visitation is an exaggerated response to defendants' legitimate security concerns. The findings of fact establish that defendants currently have real security problems and concerns as a result of contact visitation. Those same findings clearly show that barrier visitation is intended or designed to alleviate those problems.

6.) The plaintiffs have failed to meet their burden of showing that the imposition of a barrier during visitation is an exaggerated response to legitimate jail objectives. This conclusion is admittedly a close one because if equipped with the desire, contact visitation can be successfully implemented.[5] However, the findings of fact demonstrate that the gravity of the security and administrative problems and concerns encountered at the jail necessitate an alternative means of visitation. The defendants have shown that the imposition of a barrier during visitation would alleviate many of their problems and concerns. For example, a program of barrier visitation would not only reduce the opportunities for passing contraband and drugs, but would also require the use of fewer staff members, thereby increasing overall jail security. The findings of fact clearly show that the defendants' ability to maintain security and preserve internal order is jeopardized. With such a basic function at stake, the Court cannot say as a matter of law that a carefully developed form of barrier visitation is an exaggerated response.

7.) Another essential part of this Court's determination is the Supreme Court's admonition that "responsible prison officials must be permitted to 'take reasonable steps to forestall . . . threat[s] to security], and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." *Wolfish*, 441 U.S. at 551, n. 32, 99 S.Ct. at 1880, n.32, citing *Jones v. North Carolina Prisoner's Labor Union*, 433 U.S. 119, 132–133, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977). Thus, the "informed discretion of prison officials that there is *potential* danger may be sufficient for limiting rights even though this showing might be 'unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public." *Id.* (Emphasis added in *Wolfish*).

In view of the above, the Court believes that a distinction should be drawn between two types of findings of fact although they must be considered in tandem. One type of finding reflects "*real* security problems;" those that actually exist and are verifiable. The other type of finding reflects "security concerns." This latter type involves situa-

---

5. The Court notes that the Metropolitan Correctional Center, the federal institution under scrutiny in *Wolfish*, did engage in the program of contact visitation. As the findings of fact herein indicate, it is the policy of the Michigan Department of Corrections to promote a program of contact visitation because of its obvious benefits.

tions which pose a threat to security, i.e. they have not reached fruition but for security reasons must be contemplated in advance and avoided. The Court believes that its findings show that defendants do experience real security problems as a result of contact visitation. To the extent that the defendants were unable to produce evidence of a catastrophic event during contact visitation, it does not follow that defendants' security concerns in that regard are not legitimate.

8.) In this same vein, however, the Court rejects defendants' broad allegation that *Wolfish* affords them a free reign in the running of the jail. The mere recitation of a universe of possibilities will not justify a prison condition or practice. *See Valentine v. Englehardt*, 474 F.Supp. 294 (D.N.J., 1979). It must still pass constitutional muster because those constitutional rights retained by pretrial detainees must be both protected by the Courts and scrupulously observed by prison officials. *Wolfish*, 441 U.S. at 562, 99 S.Ct. at 1886.

9.) In rejecting defendants' broad allegation, the Court believes that *Wolfish* states a "general rule of deference." *Beckett v. Powers*, 494 F.Supp. 364, 367 (W.D.Wisc., 1980). Intrinsic in that rule is the realization that when passing upon prison matters, the Court is not dealing with a closed system containing a finite number of constant variables. *See, Ramos v. Lamm*, 639 F.2d 559, 579–581 (CA 10, 1980). The issue is not whether a particular prison practice or condition is "good or bad," *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 137, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977) (Burger, C. J., concurring), or whether it is the "best alternative" from among those constitutionally permissible. *Wolfish*, 441 U.S. at 542, n. 25, 99 S.Ct. at 1876, n. 25. Rather, the issue is whether it meets the constitutional minimum—the contours of which are defined by the circumstances and the right allegedly implicated. Once the Court concludes that the constitutional min-

imum has been met, judicial inquiry usually will end because the administration of the minutiae of prison operations are better left to branches of government outside the Judiciary. *Wolfish, supra* at 562, 99 S.Ct. at 1886.

10.) Turning to plaintiffs' fundamental liberty interest argument, the Court believes that when reasonable and meaningful barrier visitation is afforded a pretrial detainee, the "family relationship" is neither seriously implicated nor impermissibly interfered with. *Accord, Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 759 (CA 3, 1979). Thus, the Court rejects plaintiffs' assertion that because a family relationship of some sort may be involved in the instant matter that a different test or result is mandated.[6] The contention that the family unit is fundamental and significant is beyond question. *See, Wisconsin v. Yoder*, 406 U.S. 205, 231–233, 92 S.Ct. 1526, 1541–1542, 32 L.Ed.2d 15 (1972). Indeed, this Court recognized that fact in *O'Bryan I*, 437 F.Supp. at 598. Yet, the recognition of the family's importance in society, even when accompanied by admittedly moving testimony, does not rise to a constitutional right to touch, embrace, kiss and/or converse without a barrier during visitation in a prison under *Wolfish*.

11.) In support of their position for contact visitation, plaintiffs maintain that the Supreme Court in *Wolfish* specifically noted that it was not dealing with a fundamental liberty interest, thereby inferring that under such circumstances a different test or result may be necessary. However, the language relied upon for partial support of this claim is the Supreme Court's discussion of a pretrial detainee's "understandable desire to be as comfortable as possible during his confinement," to wit:

> And to the extent the [lower] Court relied on the detainee's desire to be free from discomfort, it suffices to say that this desire simply does not rise to the

---

**6.** Assuming this zone of privacy, the family relationship is implicated by the imposition of a barrier during visitation, the Court still believes (and so concludes) that the practice furthers a

substantial jail interest and that it is reasonably and rationally tailored to protect that interest here. *See, Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 759 (CA 3, 1979).

level of those fundamental liberty interests delineated in cases such as *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 ALR 1446 (1923).

*Wolfish*, 441 U.S. at 534–535, 99 S.Ct. at 1871–1872. When read in context and applied to the issue herein, the Supreme Court only stated that a pretrial detainee's desire to be free from discomfort does not rise to the level of a fundamental liberty interest.

12.) The Supreme Court of course has recognized under the Due Process Clause a zone of privacy around personal aspects of what may be denominated generally as the "family relationship," e.g. *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), (a child's education); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 381 U.S. 479, 14 L.Ed.2d 510 (1965), (the use of contraceptives); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), (marriage); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), (the termination of a pregnancy); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), (the raising of a child). Although the Supreme Court in *Wolfish* did not address what impact lawful incarceration may have on the family relationship, its mode of analysis and disposition of the issues are instructive. Furthermore, the Court observes that the entire *Wolfish* Court rejected the "least restrictive means" or "compelling state interest" test in prison matters. In addition to *Wolfish*, the Supreme Court has mentioned that "face to face" visitation in a prison creates legitimate security and related administrative problems and concerns. *Pell v. Procunier*, 417 U.S. 817, 826–827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

13.) Accordingly, the Court believes that when the issue involves only a type of reasonable and meaningful visitation, as opposed to token visitation or the denial of visitation in toto, it is the act of incarcerating which most profoundly affects the family relationship, because logically it is that act which separates the inmate from family members or friends. Since the legality of that incarceration is not at issue, what remains is an individual who has become part of a prison's population. Once legally within that prison, a new set of priorities takes over for not only the protection of society, but also the inmate. Presence within the prison entails out of necessity the experience of certain discomforts. So long as those discomforts resulting from legitimate penal regulations do not amount to punishment, they are constitutionally valid.

14.) The inability to touch, embrace or kiss and converse without a barrier during visitation in a prison is obviously discomforting. This disability is surely more discomforting when family is involved. The "punishment" test, when applied, does not ignore the fact that such a disability involves genuine privations and hardship. Nor does it ignore any of the "basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause." *Moore v. City of East Cleveland*, 431 U.S. 494, 499–501, 97 S.Ct. 1932, 1935–1936, 52 L.Ed.2d 531 (1977). Rather, the "punishment" test considers all of the above factors in a certain perspective; namely the unique reality attending a prison facility. Out of necessity, not every disability amounts to "punishment" under the Due Process Clause because, as a practical matter, "[l]oss of freedom of choice and privacy are inherent incidents of confinement in such a facility". *Wolfish*, 441 U.S. at 537, 99 S.Ct. at 1873.

■ 15.) In applying the above, the Court believes that the disability resulting from the imposition of a barrier during visitation, while discomforting, amounts to neither "punishment" in the constitutional sense nor privations and hardship of a con-

stitutional dimension. The Court observes that the average pretrial detention is 7.7 days at the jail. *O'Bryan I*, 437 F.Supp. at 589. Even if that detention is longer, reasonable and meaningful barrier visitation will be provided. Under such circumstances, the family relationship while affected somewhat, is neither seriously implicated nor impermissibly interfered with. The qualitative loss of choice and privacy, e.g. the inability to touch, embrace or kiss and converse without a barrier during visitation, must under *Wolfish*, be necessarily regarded as an inherent incident of lawful incarceration.

RELIEF

As a result of the Court's conclusion that contact visitation is not constitutionally required at the jail, another visitation plan must be designed. During trial, a host of safer options were expressed and discussed, some that included contact visitation and some that did not. Neither party has submitted to the Court a detailed alternative to the current visitation arrangement. Rather than setting forth the visitation plan defendants shall follow sua sponte, the Court will allow defendants thirty days from the date of this Memorandum Opinion and Order to submit a visitation proposal consistent with this Opinion. Plaintiffs shall thereafter have twenty days to respond. During at least the interim period of planning, the Court's presently applicable Order shall remain in full force.

IT IS SO ORDERED.