585 F.2d 1183
 Tyrone NORRIS, Individually and on behalf of all others
similarly situated, Appellant,
v.
Thomas G. FRAME, Individually and as Warden of Chester
County Farms Prison, Dr. Philip E. Kistler, Sergeant Mazzi,
Mr. Snyder, Sergeant Melanese, Captain Simmons, Deputy
Warden Hardy, Honorable Dominic T. Marrone, Honorable Thomas
A. Pitt, Jr., Honorable John M. Wajert, Honorable Leonard
Sugerman, Honorable John E. Stively, Jr., Honorable William
J. C. O'Donnell, William Lamb, James H. McQueen, Lawrence
Wood, Robert G. Strubile, Leo D. McDermott, Earl M. Baker,
and the County of Chester.
 No. 78-1090.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 6, 1978.
Decided Oct. 31, 1978.
 
 Lawrence H. Rudnick, West Chester, Pa., for appellant.
 Michael P. O'Connor, Joseph P. Green, Krusen Evans and Byrne, Philadelphia, Pa., John S. Halsted, Gawthrop & Greenwood, West Chester, Pa., for appellees.
 Lawrence E. Grant, Hope, Portnoff & Grant, Ltd., Paoli, Pa., for appellee, James H. McQueen.
 Before SEITZ, Chief Judge, ADAMS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 One of the most persistent problems in the administration of the criminal justice system is how to treat those individuals who have been charged with a crime but not yet convicted. In order to guarantee their presence at trial, the state may imprison citizens before their guilt or innocence is determined, but their status during this waiting period has been questioned ever since the time of Blackstone, who described the wait between arrest and trial as "this dubious interval."[1] It has been asserted that pretrial detainees have often fared worse than convicts in our prisons,[2] but in recent years many courts, through application of the due process clause, have sought to extend to them protection as great or greater than that afforded convicted prisoners.[3]
 
 
 2
 In the present case we are confronted with the question of the state's authority to discontinue a medically accepted course of treatment for drug addiction that had previously been prescribed for a pretrial detainee. The district court decided, after hearing expert medical testimony, that plaintiff's loss of access to methadone maintenance dosages at best constituted a medical malpractice claim, and did not amount to the violation of his constitutional rights necessary to support a suit under 42 U.S.C. § 1983. We conclude that under the circumstances here the refusal to allow Norris to continue to receive methadone operates to deprive him of a liberty interest without due process of law, unless the state can demonstrate that a legitimate security concern, or a genuine fear of substantial administrative disruption, warrants this interference with plaintiff's medical care. Because the record does not demonstrate a connection between the security interest justifying the incarceration of a pretrial detainee and the deprivation of liberty complained of here, the case must be remanded to the district court.
 
 I.
 
 3
 Appellant Tyrone Norris was arrested for a drug-related offense on April 23, 1975. Bail was set at $150,000,[4] but Norris was unable to post that amount. He was then taken to the Chester County Farms Prison, where he was to be detained while awaiting trial. For approximately seven months prior to his arrest, Norris had been receiving prescribed daily dosages of methadone from the Chester-Crozier Methadone Clinic in Chester, Pennsylvania, a facility licensed to dispense the drug pursuant to federal and state regulations.
 
 
 4
 On his arrival at the prison, Norris immediately informed Sergeant Mazzi, a guard, that he was participating in the Chester-Crozier program, presented his identification card, and requested that he be supplied with methadone. The next day he repeated his request to Dr. Kistler, the prison physician. Methadone was not regularly dispensed at the prison, and although Dr. Kistler and Warden Frame sometimes arranged for the transfer of prisoners with drug problems to facilities where different treatment was available,[5] Dr. Kistler concluded that that procedure was unnecessary in Norris' case. Instead, he treated Norris with thorazine, a tranquilizer, which Norris claims provided little help in dealing with the pain of withdrawal from methadone addiction.
 
 
 5
 Norris returned to the infirmary on April 28, and Dr. Kistler testified that he did not find Norris to be exhibiting the usual symptoms associated with withdrawal from addiction to drugs. The doctor also testified that Norris' failure to return with more serious symptoms and complaints indicated the stability of his condition, and justified the decision not seek outside help.[6] Norris, on the other hand, testified that he was reluctant to go to Dr. Kistler because the doctor had told him there was nothing he could do.[7]
 
 
 6
 Whatever the prison authorities knew or should have known about the severity of his condition, Norris testified that the pain was sufficient to drive him to slash his left wrist on May 2, 1975, whereupon he was hospitalized and his wrist was bandaged. Thereafter he attempted to tear out the stitches, and, as a result, the wrist became infected. Norris was returned to the Chester County Farms Prison, where he received treatment and considerable medication, including librium, valium and benadryl. He remained incarcerated at the prison for several months thereafter, but at no time did he receive permission to continue the methadone medication he had been receiving before his arrest.
 
 II.
 
 7
 Norris brought this action under 42 U.S.C. § 1983 against Chester County,[8] Warden Frame, Dr. Kistler and seventeen other named defendants, alleging that their refusal to allow him to continue to receive methadone while he was detained before trial constituted a denial of liberty without due process of law. He sought to bring suit as a member of a class, as well as individually. However, the district court refused to certify the class, ruling that it did not meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. Norris also set forth a state law claim of negligence, but the trial judge declined jurisdiction over any pendent claim after he had rejected the federal cause of action.
 
 
 8
 The district court, sitting without a jury, concluded that the facts alleged established, at most, medical malpractice, which alone does not amount to the constitutional violation necessary to proceed under § 1983. In adopting an eighth amendment analysis to evaluate Norris' claim, the trial court said:
 
 
 9
 While we are sympathetic to the plight of an individual such as Mr. Norris who undergoes drug withdrawal while incarcerated, we feel that his legal claims rise no higher than alleging inadequacy or impropriety of treatment. It is not alleged that the plaintiff was denied medical attention; both the plaintiff and Dr. Kistler testified that he received considerable medical attention during his incarceration at Chester County Farms. Neither did his medical treatment consist of acts which were either intentionally injurious, callous, grossly negligent, shocking to the conscience, unconscionable, intolerable to the fundamental fairness or barbarous. We adhere to the standard enunciated by Judge Luongo in Roach v. Kligman, 412 F.Supp. 521, 525 (E.D.Pa.1976) wherein he held: "Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim." We are of the opinion that the same standard applies to claims made under the Fourteenth Amendment.[9]
 
 
 10
 It is true that this Court has previously held that a doctor's negligence is insufficient to support a § 1983 suit brought by a prisoner.[10] Under the rule of Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), to establish a predicate for a § 1983 claim, a previously convicted plaintiff must allege "deliberate indifference to serious medical needs."[11] Estelle v. Gamble, however, did not present the question whether the state is justified in treating a detainee as it would a convicted prisoner. The trial judge in the present case admittedly rested his opinion on the assumption that the same standard is to be applied to claims brought by pretrial detainees under the fourteenth amendment as is properly applied to claims brought by convicted prisoners under the eighth amendment. We do not agree.
 
 
 11
 Because of the difficult task confronting prison officials, federal courts should be reluctant to interfere in matters relating to the internal administration of the states' correctional facilities. If a prison practice offends a constitutional guarantee, however, no policy of judicial restraint can justify a failure to vindicate valid constitutional claims. Procunier v. Martinez, 416 U.S. 396, 405-06, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Main Road v. Aytch, 522 F.2d 1080 (3d Cir. 1975).
 
 
 12
 The protection afforded convicted felons under the eighth amendment is often useful "by analogy" in determining the protection to be afforded detainees under the fourteenth amendment. Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1079-80 (3d Cir. 1976). The two levels of protection, however, should not be thought of as co-extensive. Courts have used eighth amendment cases for pretrial detainees because detainees have often alleged that they are confined under conditions worse than those prevailing for convicts. See Detainees of Brooklyn House of Detention for Men v. Malcolm,520 F.2d 392 (2d Cir. 1975); Rhem v. Malcolm, 507 F.2d 333 (2d Cir. 1974). In such cases, the eighth amendment standard may be taken as a legitimate starting point because, as this Court noted in Hampton v. Holmesburg Prison Officials, supra, "(i)t would be anomalous to afford a pretrial detainee less constitutional protection than one who has been convicted."546 F.2d at 1079-80.
 
 
 13
 However, cases forbidding the imposition on a detainee of conditions or deprivations that would constitute "cruel and unusual punishment" if inflicted on a convict should not be read to limit a detainee only to that level of protection. Although a convict is not wholly stripped of his constitutional rights when he is imprisoned,[12] he is subject to punishment by the state, and part of that punishment is deprivation of his liberty. A detainee on the other hand, may not be "punished" at all. He is entitled to such liberty as does not undermine the legitimate state interests related to his detention. The fourteenth amendment, therefore, must be read so as to recognize the distinct status of a pretrial detainee: a citizen not yet convicted, yet at the same time not possessing the full range of freedoms of an unincarcerated citizen. To limit his constitutional rights to a protection from cruel and unusual punishment would be to rely completely on an analogy to a constitutional provision that is not truly applicable at all. See Ingraham v. Wright, 430 U.S. 651, 671 n.40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir.) Cert. denied 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).
 
 
 14
 The one legitimate state interest that can warrant a deprivation of a detainee's liberty is the same interest that justifies the detention itself. Thus, this Court has stated that "the only legitimate state interest in the detention of an accused who cannot raise bail is in guaranteeing his presence at trial." Tyrrell v. Speaker, 535 F.2d 823, 827 (3d Cir. 1976). Society has found it necessary to confine detainees in cases where there are significant doubts about their appearance at trial. Additional restrictions imposed on detainees are defensible only when they can be justified by the requirements of prison administration, or are inherent in the nature of confinement. If the added burdens do not meet this standard, they violate the detainee's constitutional right to due process of law.
 
 
 15
 The Second Circuit, in Wolfish v. Levi,[13] has stated this due process test as follows
 
 
 16
 it is not enough that the conditions of incarceration for individuals awaiting trial merely comport with contemporary standards of decency prescribed by the cruel and unusual punishment clause of the eighth amendment. Time and again, we have stated without equivocation the indisputable rudiments of due process: pretrial detainees may be subjected to only those "restrictions and privations" which "inhere in their confinement itself or which are justified by compelling necessities of jail administration." This standard of compelling necessity is neither rhetoric nor dicta. And we have made it clear that deprivation of the rights of detainees cannot be justified by the cries of fiscal necessity, administrative convenience, or by the cold comfort that conditions in other jails are worse.[14]
 
 
 17
 It should be noted that the standard enunciated by Wolfish leaves prison officials with considerable discretion in the administration of correctional facilities. If the fact of confinement itself justifies challenged restrictions, the Court will not "second-guess" administrators regarding the best means to protect their legitimate security interests.[15] But in order for the prison to defend the means it has chosen, it must first demonstrate that they are means aimed at the proper end: the security interests of the prison.
 
 III.
 
 18
 Norris has sufficiently established that the defendants' actions constituted an interference with his liberty. At the time of the events in question, Norris had not been convicted of any crime and was held solely because he could not meet the high bail set after his arrest. He has demonstrated that he had regular methadone medication prescribed for him at the Chester-Crozier Clinic, that this treatment was legal and medically accepted,[16] and that the prison was on notice of those facts.
 
 
 19
 Under different circumstances, it might be that no interference could be proved. There is no constitutional right to methadone and the County is under no duty to provide it. Methadone is a carefully controlled substance and may be dispensed to qualifying recipients only by approved facilities. See21 C.F.R. § 310.505; 4 Pa.Code § 263. Although Pennsylvania law requires that addicts receive "medical detoxification" if incarcerated, 71 P.S. & 1690.106(a), it does not require the establishment of methadone maintenance facilities at correctional institutions. 4 Pa.Code § 263.22. No prisoner, pretrial detainee or citizen can compel the state to provide him with the drug.
 
 
 20
 Norris' argument, however, is not aimed at such a result. He was already receiving methadone as a qualifying participant in an approved program. By incarcerating him at Chester County Farms Prison the state terminated this course of treatment without, as yet, demonstrating a legitimate interest in so doing. Pennsylvania has established procedures for the termination of a methadone recipient,[17] but they were not followed here. Moreover, the decision to conclude the treatment is left to the authorized methadone facility, here the Chester-Crozier Clinic, and not delegated to penal authorities. All Norris maintains is that he should have been allowed, if possible, to continue to receive his previously prescribed treatment, at least until the Chester-Crozier Clinic ascertained that it should be ended.
 
 
 21
 Given this interference with his status as a recipient of methadone treatment and the discontinuance of a regimen prescribed for and available to him, Norris may properly assert a deprivation of a liberty interest. Under these circumstances, defendants' actions must be judged in the light of the legitimate state interests that would justify such a deprivation, noted by this Court in Tyrrell v. Speaker and set out by the Second Circuit in Wolfish.
 
 
 22
 At trial, officials at the Chester County Farms Prison defended their treatment of Norris on the basis of good faith and medical judgment. These arguments may have considerable significance in the ultimate resolution of much of this case. But the initial question must be whether their refusal to allow him access to a prescribed course of treatment constitutes a restriction that is inherent in confinement and the needs of orderly prison administration or whether it is an additional restriction, unrelated to guaranteeing Norris' presence at his trial or security at the institution. Defendants suggest that legitimate reasons of prison security can be put forward to justify their refusal of Norris' request, but nothing in the evidence supports this claim, and it may be doubtful given the past practice at Chester County Farms Prison of securing treatment from outside facilities in similar cases. On this record, it cannot be said with any certainty whether such a security interest can be demonstrated. Accordingly, it will be necessary to remand the case for this determination to be made.[18]
 
 
 23
 The judgment of the district court will be vacated and the case remanded for further proceedings in accordance with this opinion.
 
 
 
 [1]
 "(This) imprisonment, as has been said is only for safe custody, and not for punishment; therefore, in this dubious interval between commitment and trial, a prisoner ought to be used with the utmost humanity; and neither be loaded with needless fetters, nor subjected to other hardships than such are requisite for the purpose of confinement only." 4 W. Blackstone, Commentaries * 300
 
 
 [2]
 See Comment, Constitutional Limitations on the Conditions of Pretrial Detention, 79 Yale L.J. 941 (1970)
 
 
 [3]
 See e. g. Wolfish v. Levi, 573 F.2d 118, 124 (2d Cir. 1978) Cert. granted sub nom. Bell v. Wolfish, --- U.S. ----, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978). Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976); Tyrrell v. Speaker, 535 F.2d 823 (3d Cir. 1976); Cudnik v. Kreiger, 392 F.Supp. 305 (N.D.Ohio 1974). See also Comment, The Rights of Prisoners to Medical Care and the Implications for Drug-Dependent Prisoners and Pretrial Detainees, 42 U.Chi.L.Rev. 705 (1975)
 
 
 [4]
 Norris' bail was later reduced to $50,000, but he was unable to meet this amount either. 186a
 
 
 [5]
 127a
 
 
 [6]
 287a
 
 
 [7]
 189a. This testimony is contradicted by Dr. Kistler. 134a
 
 
 [8]
 The district court dismissed the suit against Chester County. Since that determination, the Supreme Court, in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), has ended local government immunity from civil rights suits. Under Monell, however, Chester County would be liable only for the results of "official policy" and not under a theory of respondeat superior. Id. 690 - 698, 98 S.Ct. 2035 - 2039. On remand the district court may wish to reexamine the question of Chester County's liability under the Monell rule
 
 
 [9]
 Norris v. Frame, slip op. at 2-3 (E.D.Pa.1977), Reprinted in Appendix, 87a-88a
 
 
 [10]
 Gittlemacker v. Prasse, 428 F.2d 1 (3d Cir. 1970)
 
 
 [11]
 a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. 429 U.S. at 106, 97 S.Ct. at 292
 
 
 [12]
 Wolff v. McDonnell, 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). See also Comment, The Religious Rights of the Incarcerated, 125 U.Pa.L.Rev. 812 (1977)
 
 
 [13]
 573 F.2d 118 (2d Cir. 1978), Cert. granted sub nom. Bell v. Wolfish, --- U.S. ----, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978)
 
 
 [14]
 Id. 124 (citations omitted)
 
 
 [15]
 Id. See also Feeley v. Sampson, 570 F.2d 364 (1st Cir. 1978); Main Road v. Aytch, 565 F.2d 54 (3d Cir. 1977)
 Wolfish v. Levi would not allow "administrative convenience" to justify additional restrictions on detainees, but would allow deference to the "compelling necessities of jail administration." 573 F.2d at 124. In our view, a potential for substantial administrative disruption constitutes a legitimate security interest. Although the "convenience" of prison administrators, standing alone, would not warrant interference with a detainee's liberty, rules and practices necessary to the orderly administration of a penal institution may be defended as "inherent in confinement." As we have noted, we have no intention of strictly scrutinizing every jail procedure on a compelling necessity standard. But we cannot allow the deprivation complained of here, absent a showing of a substantial relationship to a prison security interest. The defendants have made no such showing to this point.
 
 
 [16]
 A different case might be presented if a detainee insisted on receiving treatment that was illegal or medically indefensible. Here, however, the state merely substituted its own medical judgment for an already prescribed course of treatment without demonstrating the illegality, inadequacy, or impropriety of the prescribed treatment, or that such treatment would disrupt the prison or create a security hazard
 
 
 [17]
 4 Pa.Code § 263.17 reads:
 (a) All methadone projects may involuntarily terminate a client from the project if it deems that such termination would be in the best interests of the health or safety of the client, or the methadone project finds any of the following conditions to exist or have existed:
 (1) The client has committed threats or acts of physical violence in or around the methadone project premises.
 (2) The client has sold, distributed, or possessed, in or around the methadone project premises, controlled substances without a lawful prescription.
 (3) The client has been excessively absent from the methadone project.
 (4) The client has been absent for seven days consecutively without cause.
 (5) The client has failed to follow his treatment plan.
 (6) The client has had consistently positive urines.
 (7) The client has failed to seek employment, training, or education.
 (b) All involuntary terminations shall be reported to the Executive Director of the Council, in writing, with reasons therefor, within 72 hours after the termination occurs.
 (c) Any client involuntarily terminated shall be afforded the opportunity to receive methadone detoxification over a period of time not to exceed 21 days, but not less than seven days.
 
 
 [4]
 Pa.Code § 263.18 reads:
 All methadone projects shall develop and utilize a client appeal procedure. Such procedure shall permit aggrieved clients a full and fair opportunity to be heard, to question and confront persons and evidence used against him and have a fair review of his case by the Director of the methadone project.
 The client appeal procedure shall be in writing, and shall be available for inspection by representatives of the Council.
 
 
 [18]
 On remand the district court may also wish to re-examine its rulings on class certification and the exercise of jurisdiction over appellant's pendent state law claims
 Although Norris' argument for certification under Fed.R.Civ.P. 23(b)(2) is not free from difficulties, he is correct in noting that under that rule he need not show "that a class action suit is superior to other methods of handling such a suit," a requirement alluded to by the district court. The "superiority" requirement applies to certification under Fed.R.Civ.P. 23(b) (3). In the event that an analysis under Fed.R.Civ.P. 23(b)(2) changes the trial judge's determination, and if appellant is able to satisfy the other objections to certification stated in the district court opinion, this aspect of the case may warrant reconsideration.
 Because Norris' federal cause of action is not a frivolous one, and considering the factual connection between the separate causes of action and the hardship imposed on Norris because he is now barred by the state statute of limitations, the trial judge may also elect to exercise pendent jurisdiction over the state law claim under the doctrine of United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This matter, of course, is best left to the discretion of the district court.