612 F.2d 754
 INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey,
Arthur Goslee, Harry Smith, Robert Maloney, and
Calvin Milligan on their own behalf and
on behalf of all others
similarly situated, Appellants,
v.
Robert PIERCE, Chairman, Allegheny County Board of Prison
Inspectors and all other members of the Board; James
Jennings, Warden of Allegheny County Jail; and James
Flaherty, Robert Pierce and Thomas Foerster, Commissioners
for Allegheny County; John P. Lynch, Controller for
Allegheny County; Eugene Coon, Sheriff for Allegheny County;
The Honorable Henry Ellenbogen, The Honorable John W.
O'Brien, The Honorable Samuel Strauss, and The Honorable
Patrick R. Tamila, Judges of the Court of Common Pleas of
Allegheny County; Peter Flaherty, Mayor of the City of Pittsburgh.
 No. 78-2621.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 4, 1979.
Decided Dec. 28, 1979.
 
 Jere Krakoff (argued), Mark B. Greenblatt, Jon Pushinsky, Neighborhood Legal Services Association, Pittsburgh, Pa., for appellants.
 Alexander J. Jaffurs, County Sol., Dennis R. Biondo (argued), Asst. County Sol., Pittsburgh, Pa., for appellees.
 Before ALDISERT, ROSENN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 We are faced on this appeal with a challenge to certain conditions of confinement for pretrial detainees incarcerated in the Allegheny County Jail. On June 2, 1976, inmates of the jail ("Inmates") filed a class action against the Allegheny County Board of Prison Inspectors ("Board") and other county officials under 42 U.S.C. § 1983 seeking a declaratory judgment that the conditions violate the constitutional rights of the inmates.
 
 
 2
 On January 4, 1978, the district court issued the first of its two opinions. Owens-FI v. Robinson, 442 F.Supp. 1368 (W.D.Pa. 1978). Although it found that many of the challenged conditions did violate the constitutional rights of the inmates, it held against them on the issues of contact visits, methadone treatment, and psychiatric care. These findings were incorporated in the court's final opinion and order of October 11, 1978. 457 F.Supp. 984. The Inmates appealed. We affirm on the issues of contact visits and drug detoxification, and remand on the issue of psychiatric care.
 
 I.
 
 3
 The Allegheny County Jail is used primarily as a detention facility for persons awaiting trial. In addition to pretrial detainees, other inmates are also housed at the jail. These include: inmates who have been convicted but are awaiting sentencing; inmates who have been committed to the jail for misdemeanors for relatively short sentences; inmates on a work-release program; federal prisoners awaiting trial or sentencing; and state and federal prisoners from other institutions held in the jail while testifying in pending state and federal cases. The average daily population is approximately 430 inmates with an average length of confinement of about three weeks. Many inmates, however, are confined for substantially longer periods of time.
 
 
 4
 The Inmates' action against the Board sought broad scale relief from allegedly unconstitutional conditions at the jail. The district court found that many of the challenged conditions did indeed fall below the constitutional minimum and granted substantial relief.
 
 
 5
 Although not dispositive of the appeal before us, it is instructive to briefly summarize the conditions found to exist by the district court. Living facilities were unhealthy and unsafe. The plumbing system was antiquated and in disrepair. As a result, leaks and overflows frequently occurred in the cells. The cells lacked adequate lighting; the efforts of inmate-electricians seeking to remedy that defect caused exposed electrical wires which presented fire and shock hazards. Prisoners were required to sleep on canvas cots, many of which were discolored by blood, vomit, feces, and urine. Vermin abounded. Cell temperatures fluctuated between extreme cold in the winter and extreme heat in the summer. The shortage of guards reduced supervision of the inmates and permitted hoarding and vandalism of necessary supplies. This in turn contributed significantly to chronic shortages of necessary items such as blankets and bath towels.
 
 
 6
 Inmates with a wide spectrum of emotional and mental problems, ranging from simple "acting-out" behavior to drug withdrawal, delirium tremens, epileptic seizures, and mental instability, were confined in the "restraint room." Clothed in hospital gowns or left naked, there they were bound to canvas cots with a hole cut in the middle. A tub was placed underneath the hole to collect the body wastes of the occupant.
 
 
 7
 Some inmates were placed in solitary confinement for up to fourteen days without a mattress, toilet articles, or a change of clothing. Other inmates were confined in the nude in the isolation cell, an unfurnished, darkened, windowless room for up to fourteen consecutive hours, without any blankets or sheets.
 
 
 8
 In short, conditions in the jail were shockingly substandard and, the district court found, well below the minimum required by the Constitution. Accordingly, the court entered an order providing relief. The Board does not challenge these findings or the terms of the district court's order. In addition, however, the district court denied the Inmates relief in three specific areas. These denials form the basis of the Inmates' appeal presently before us.
 
 
 9
 Currently, jail policy precludes inmates and their visitors from physical contact, restricting them instead to booths in which the inmate and visitor are separated by a pane of glass and communication is by telephone.[1] The district court upheld this practice as a legitimate restriction in light of the security interests of the jail.
 
 
 10
 The Inmates also challenge the method of drug detoxification at the jail. Currently, any inmate who has been receiving methadone treatment from an authorized treatment center in Allegheny County prior to his incarceration is allowed to receive such treatment for six days following the date of confinement, after which the treatment is terminated. The district court upheld this practice as within the sound discretion of prison medical authorities.
 
 
 11
 Finally, the Inmates challenge the system of psychiatric care at the jail alleging it to be constitutionally inadequate because of insufficient staffing. Although the court ordered psychiatric training for all nurses at the jail and prohibited the further use of restraint cots, it expressed no opinion as to the constitutional sufficiency of the general level of psychiatric care.
 
 II.
 
 12
 The Inmates' first contention on appeal is that the district court erred in ruling that the prohibition of contact visits does not deprive the Inmates of their due process rights under the fourteenth amendment. They argue that, under Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the denial of contact visits represents an "exaggerated response" to an asserted security interest and therefore constitutes a denial of due process. We disagree.
 
 
 13
 In Bell v. Wolfish, the Supreme Court considered the standard to be applied in evaluating conditions of pretrial detention. The Court held that "(i)n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law we think the proper inquiry is whether those conditions amount to punishment of the detainee." Bell v. Wolfish, supra, 441 U.S. at 535, 99 S.Ct. at 1872.
 
 
 14
 Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "(w)hether an alternative purpose to which (the restriction) may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned (to it)." . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment". . . . Conversely if a restriction or condition is not reasonably related to a legitimate goal if it is arbitrary or purposeless a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees Qua detainees.
 
 
 15
 441 U.S. at 538-539, 99 S.Ct. at 1874. The Court admonished lower courts that the government's interest in maintaining security and order and operating the institutions in a manageable fashion is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." 441 U.S. at 540, 99 S.Ct. at 1875 n. 23.
 
 
 16
 The Inmates argue that there is very little likelihood that additional contraband will find its way into the jail if contact visits are allowed and that contraband will be introduced into the jail in any case. They urge that a plan recommended by the court adviser[2] which would have allowed contact visits in certain instances, is a reasonable alternative to the absolute prohibition presently imposed and would provide adequate protection for security interests at the jail. Under that plan inmates would not be eligible for contact visits until after having spent 45 days in confinement. The Inmates argue that this plan would protect security interests in a number of ways. First, it would limit the number of contact visits to a manageable level and thus eliminate the need to make major structural changes in the jail. Second, the waiting period would give the jail administration sufficient time to observe the various inmates and identify which of them would pose security risks if permitted to have contact visits. It also would afford the institution sufficient time to set up a visitor list for eligible inmates and determine which visitors might pose security problems.
 
 
 17
 The Inmates' arguments, however, are unpersuasive. Even though the chances of additional contraband being introduced into the jail by virtue of contact visits may well be small, prohibition of such visits is, nevertheless, not unreasonable. In Bell v. Wolfish the Court upheld body cavity inspection of inmates conducted after contact visits. The Court noted that, although
 
 
 18
 there has been only one instance where an . . . inmate was discovered attempting to smuggle contraband into the institution on his person (this), may be more a testament to the effectiveness of . . . (the body cavity search) as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.
 
 
 19
 Bell v. Wolfish, supra, 441 U.S. at 559, 99 S.Ct. at 1884-1885.
 
 
 20
 The rationale applied in Wolfish is applicable here, particularly because the procedure the Court upheld was directed at detecting contraband that the prisoners might attempt to smuggle in after contact visits. Testimony in this case, by both the present and past wardens of the jail indicates that preventing the introduction of contraband into the jail is the primary reason for the ban on contact visits. The district court chose to credit that testimony and we cannot say that its decision was clearly erroneous. The court found that "(a)llowing contact visits would present a security problem at the jail." Thus, even though the chance of additional contraband reaching the jail as a result of contact visits may be remote, jail officials may reasonably act to remove even that remote possibility.
 
 
 21
 Similarly, the existence of other less restrictive alternatives is also not dispositive. As the Court indicated in Wolfish, unless the decision of prison authorities has a punitive purpose or is unreasonable or exaggerated in relation to an otherwise legitimate purpose, it is entitled to deference.
 
 
 22
 There is no indication in the record that the prohibition was adopted for purposes of punishment. The Inmates, however, further argue that the prohibition of contact visits encroaches upon a fundamental zone of privacy, the family relationship, and therefore, is deserving of heightened scrutiny even under Bell v. Wolfish. However, assuming a fundamental right is implicated by the prohibition of contact visits, we believe that prohibition to be a permissible restriction in the context of this case.
 
 
 23
 As the Court noted in Wolfish, "even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell v. Wolfish, supra, 441 U.S. at 547, 99 S.Ct. at 1878. See Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). As we noted above, the prohibition of contact visits is a reasonable response to legitimate concerns of prison security. An inmate is not precluded from visiting with members of his family and others, but only from physical contact with those individuals.[3] Thus the restriction is specifically tailored to meet the perceived security problem. Further, the district court noted that, were contact visits to be allowed, other costly and extensive security measures would be required to prevent the entry of contraband. Where contact visits are allowed such measures include: installation of metal detectors, fluoroscopes, strip search rooms, and the testing of urine samples for drugs. The court found that requiring these in the antiquated facilities of the Allegheny County jail "would place an undue burden on the administration." In such circumstances, a ban on contact visits represents a reasonable choice by prison officials between alternative methods of protecting the legitimate security interests of the jail.[4] Thus, we affirm the holding of the court permitting the jail officials to prohibit contact visits.
 
 III.
 
 24
 The Inmates' next claim is that the district court erred in its finding that the system of methadone treatment at the jail does not constitute a denial of due process. Inmates of the jail who have been receiving methadone treatment prior to incarceration from an approved clinic in Allegheny County[5] are given methadone treatment through their sixth day of confinement, after which treatment is terminated.[6]
 
 
 25
 The testimony of the medical experts conflicted; one testified that seven days of methadone treatment would be sufficient and another advocated administering decreasing methadone dosages over a twenty-one day period. Both the prior and present jail physicians approved of the jail's program of treatment. The district court concluded that the appropriate form of treatment involved a "discrete medical judgment" and it found no abuse of discretion of the jail physicians regarding the choice of treatment. On this record, we perceive no "deliberate indifference" to the inmates' serious medical needs in disregard of the standard enunciated in Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).
 
 
 26
 The Inmates, however, argue that our opinion in Norris v. Frame, 585 F.2d 1183 (3d Cir. 1978), requires that we vacate the district court's holding and remand for further fact finding. In Norris, we held that because Pennsylvania has by regulation provided specific procedures for termination of methadone treatment, Id. at 1189 n.17, a pretrial detainee who has been receiving such treatment in an approved program prior to incarceration, has a due process liberty interest in the continuation of such treatment. We held that when prison officials seek to terminate that treatment other than in accordance with the procedures required by that regulation they must "demonstrate . . . a legitimate security concern, or a genuine fear of substantial administrative disruption." Id. at 1185.
 
 
 27
 Our opinion in Norris, however, must be read in light of the Supreme Court's opinion in Bell v. Wolfish, supra. There the Supreme Court set forth the standard to be used in evaluating the constitutionality of conditions of pretrial confinement. The governing inquiry, as we noted above, is whether the particular condition or restriction has a punitive purpose. "Absent a showing of an expressed intent to punish on the part of detention facility officials," we must determine "(w)hether an alternative purpose to which (the restriction) may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned (to it)." Bell v. Wolfish, supra, 441 U.S. at 538, 99 S.Ct. at 1873-1874.
 
 
 28
 In this case, there is nothing in either the district court's opinion or the record of the testimony presented at trial which indicates a punitive purpose on the part of jail authorities. The district court itself held that, given the circumstances, the methadone treatment provided at the jail constituted a reasonable medical decision. We believe the record supports the court's conclusion.
 
 
 29
 There also appears to be a permissible purpose in curtailing the methadone treatment. Jail authorities may reasonably act so as to exclude contraband from the jail environment. See Bell v. Wolfish, supra. Thus, they may prohibit contact visits, regulate the material received by inmates from outside the jail, or institute strip searches of inmates after contact visits with non-inmates. Such measures have been held to be reasonably related to the legitimate concerns of institutional security. This type of concern is also evinced in the testimony of the jail wardens. It appears to us that such a legitimate security interest is also present in the jail's restriction of methadone treatment. Drug use in jails or prison facilities is certainly of the utmost concern to jail and prison authorities. That is true whether the drug is heroin, marijuana, or methadone. The potential for jail or prison disruption caused by the presence of drugs is well-known. Thus, jail authorities have a legitimate security concern in limiting exposure of inmates to drugs, even those administered on a controlled basis, to as short a period of time as is medically reasonable. We therefore perceive no error in the district court's approval of the methadone detoxification program.
 
 IV.
 
 30
 The Inmates' final contention is that the relief granted by the district court, fails to raise the level of psychiatric care at the jail to the constitutionally required minimum.
 
 
 31
 Expert testimony at trial indicated that, of an average daily population at the jail of approximately 430 inmates, between 60 and 80 could reasonably be expected to have "easily identifiable and fairly serious mental health problems." Notwithstanding, there are no psychiatric care professionals on the staff of the jail. The medical staff consists of one part-time physician and five registered nurses. Although the doctor is on call twenty-four hours a day he spends approximately two hours a day at the jail. Of this, generally less than fifteen minutes per day is spent in the jail hospital which includes the restraint ward. Testimony indicated that the doctor spends approximately 35 seconds with each patient in restraint in reaching his decision as to the need for continued restraint. No nurses are stationed in the jail hospital. A nurse will visit the hospital twice every shift for fifteen or twenty minutes in order to dispense medication.
 
 
 32
 Some assistance is provided to the jail physician by the psychiatrists of the Allegheny County Behavior Clinic. The Clinic is under the jurisdiction of the Allegheny County Court of Common Pleas and is responsible for evaluating all persons charged with homicide, sex offenses, and certain other crimes regardless of whether they are incarcerated. The Clinic, however, has no formal responsibility for psychiatric diagnosis and treatment of inmates of the jail. Nevertheless, when requested by the jail physician, a Behavior Clinic psychiatrist will see patients at the jail and recommend medication. The decision whether to actually prescribe and administer the medicine remains with the jail physician, however. This is because the Clinic is primarily diagnostic and is not involved in treatment. Even then, testimony indicates the psychiatrist will generally see a patient only one time, although where deemed necessary more visits will be made. From the record it appears that the diagnosis offered by the Clinic is conclusory and without the sort of full explanation that would normally be offered if the case had been referred by another physician. The record also indicates that restraint and administration of psychotropic medication remain the primary methods of treatment for psychiatric disturbances at the jail. Expert testimony indicates that without the close supervision that is lacking at the jail, administration of such drugs is likely to be either ineffective or dangerous.
 
 
 33
 The district court's order does provide some relief: the court forbade the further use of restraint cots, limited the use of restraints in general, and ordered that all nurses at the jail receive psychiatric training. The court, however, expressed no finding as to the adequacy of psychiatric care at the jail.
 
 
 34
 Although negligence in the administration of medical treatment to prisoners is not itself actionable under the Constitution, failure to provide adequate treatment is a violation of the eighth amendment when it results from "deliberate indifference to a prisoner's serious illness or injury." Estelle v. Gamble, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Because the case before us involves pretrial detainees, rather than convicted prisoners, our analysis must proceed under the Due Process Clause of the fourteenth amendment rather than the eighth amendment. See Bell v. Wolfish, supra, 441 U.S. at 535, 99 S.Ct. 1861. Nevertheless, "(i)t would be anomalous to afford a pretrial detainee less constitutional protection than one who has been convicted." Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1079-80 (3d Cir. 1976). Thus, at a minimum the "deliberate indifference" standard of Estelle v. Gamble, must be met. As we noted in West v. Keve, 571 F.2d 158 (3d Cir. 1978), the Estelle test is two-pronged. "It requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." Id. at 161.
 
 
 35
 Appropriately, this test affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977). Implicit in this deference to prison medical authorities is the assumption that such an informed judgment has, in fact, been made. When, however, prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment, the constitutional standard of Estelle has been violated. West v. Keve, supra, 571 F.2d at 162.
 
 
 36
 Systemic deficiencies in staffing which effectively deny inmates access to qualified medical personnel for diagnosis and treatment of serious health problems have been held to violate constitutional requirements. In Gates v. Collier, 349 F.Supp. 881 (N.D.Miss.1972), Aff'd, 501 F.2d 1291 (5th Cir. 1974), for instance, the court found that "(t)he medical staff and available facilities (at the Mississippi State Penitentiary) fail to provide adequate medical (treatment) for the inmate population." 349 F.Supp. at 888. As a result the court ordered the hiring of additional medical staff, both physicians and nurses, to bring the level of medical care up to the constitutional minimum.
 
 
 37
 In Newman v. Alabama, 349 F.Supp. 278 (M.D.Ala.1972), Aff'd, 503 F.2d 1320 (5th Cir. 1974), Cert. denied, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975), the court found that "gross understaffing" of medical facilities in the Alabama prison system constituted a constitutional violation. As the Second Circuit noted in Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977), "(w) hen systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers." See Bishop v. Stoneman, 508 F.2d 1224 (2d Cir. 1974). Thus, where the size of the medical staff at a prison in relation to the number of inmates having serious health problems constitutes an effective denial of access to diagnosis and treatment by qualified health care professionals, the "deliberate indifference" standard of Estelle v. Gamble has been violated. In such circumstances, the exercise of informed professional judgment as to the serious medical problems of individual inmates is precluded by the patently inadequate size of the staff.
 
 
 38
 Although most challenges to prison medical treatment have focused on the alleged deficiencies of medical treatment for physical ills, we perceive no reason why psychological or psychiatric care should not be held to the same standard. The leading case in this respect is Bowring v. Godwin, supra. There, in holding that a convicted prisoner is entitled to psychological or psychiatric care for serious mental or emotional illness, the court noted that it saw "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." Bowring v. Godwin, supra, 551 F.2d at 47. See Laaman v. Helgemoe, 437 F.Supp. 269 (D.N.H.1977). Further, expert testimony received at trial in the instant case indicated that the failure to provide necessary psychological or psychiatric treatment to inmates with serious mental or emotional disturbances will result in the infliction of pain and suffering just as real as would result from the failure to treat serious physical ailments. Thus, the "deliberate indifference" standard of Estelle v. Gamble is applicable in evaluating the constitutional adequacy of psychological or psychiatric care provided at a jail or prison. The key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate[7] is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances. We hold that, when inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals, the system of care does not meet the constitutional requirements set forth by Estelle v. Gamble, supra, and thus violates the Due Process Clause.
 
 
 39
 The record before us indicates there are substantial deficiencies in the system of psychiatric care at the Allegheny County Jail. Nevertheless, we are not confident that the record accurately reflects existing conditions at the jail. As indicated at oral argument, it does not contain the two reports of the advisor appointed by the district court nor does it reflect the change in conditions caused by the district court's order.[8] Furthermore, the district court did not make a specific finding as to the adequacy of the system for psychiatric care at the jail. We, therefore, remand to the district court for its determination whether the level of psychiatric care meets the constitutional minimum in light of the standards which we have articulated.[9] Should the district court determine that the constitutional requirements have not been satisfied, it will then, of course, order such relief as it finds is required.
 
 V.
 
 40
 The judgment of the district court accordingly will be affirmed on the issue of contact visitation and drug detoxification. The district court's judgment on the issue of psychiatric care will be vacated and the case remanded for further proceedings not inconsistent with this opinion.
 
 
 41
 Each side to bear its own costs.
 
 
 42
 ALDISERT, Circuit Judge, concurring and dissenting.
 
 
 43
 Because I find no error in the disposition by the trial court of the three basic constitutional issues presented by this appeal contact visits, methadone treatment, and psychiatric care I would affirm the judgment of the district court in full. Accordingly, I join parts II and III of Judge Rosenn's opinion affirming those portions of the district court's judgment which determine that the county jail rules prohibiting contact visitations and administering methadone treatment do not offend the fourteenth amendment. For the reasons that follow, however, I dissent from the majority's reversal of that part of the judgment relating to psychiatric care.
 
 I.
 
 44
 In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the prisoner-plaintiff suffered a back injury during a prison work assignment when a bale of cotton fell on him. He was initially examined and returned to work but then was re-examined, prescribed a painkiller, and permitted to remain in his cell. During a three month period he was seen by medical personnel on seventeen occasions but, allegedly, was treated inadequately for his back injury, high blood pressure, and heart problems. Presented with the opportunity for deciding when faulty medical treatment of an inmate amounts to a constitutional deprivation, the Court determined that the government has an obligation to provide medical care for those it is punishing by incarceration, that Denial of medical care causes pain and suffering inconsistent with contemporary standards of decency, and then concluded that deliberate indifference to serious medical needs of prisoners constitutes a violation of the eighth amendment:
 
 
 45
 (D)eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once proscribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.
 
 
 46
 429 U.S. at 104-05, 97 S.Ct. at 291 (citations and footnotes omitted). The deliberate indifference standard, however, was clarified by the Court to include only "wanton infliction of unnecessary pain" and not circumstances caused by an accident or by inadvertent failure:
 
 
 47
 Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.
 
 
 48
 429 U.S. at 106, 97 S.Ct. at 292. Subsequently, in Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court specifically instructed that the proper constitutional inquiry is whether conditions of pretrial detention amount to punishment of the detainee.
 
 
 49
 It is against the standards announced in Estelle and Wolfish that we must evaluate the claims that the psychiatric procedures offend the eighth and fourteenth amendments. In my view, the legal precepts that control require us to decide whether appellants met their burden of proof before the district court by satisfying (1) the test of Estelle : whether there was "deliberate indifference to serious medical needs" constituting "unnecessary and wanton infliction of pain," and (2) the test of Wolfish : whether conditions or medical treatment were designed "for the purpose of punishment," or if not expressly so designed, were "not reasonably related to a legitimate goal," or were "arbitrary or purposeless." 441 U.S. at 539, 99 S.Ct. at 1874.
 
 II.
 
 50
 Applying these legal precepts to the facts adduced at trial on the adequacy of psychiatric treatment, I concur in the result reached by the district court. I agree with the majority that the district court made no findings Ipsissimis verbis as to the adequacy of psychiatric care at the jail, but after examining a voluminous record and a comprehensive opinion dealing with many phases of jail conditions, supplemented by decrees which ordered sweeping reforms, I find no fault in the district court's final resolution of the constitutional issues relating to psychiatric care. By ordering special training for the nurses, the district court implicitly considered it unnecessary to require the jail to install additional professional staff or procedures in order to meet minimum constitutional standards. Judge Cohill ordered:
 
 
 51
 14. A sufficient number of nurses who qualify as psychiatric nurses shall be employed so that there will be at least one psychiatric nurse on duty at the jail at all times.
 
 
 52
 Appendix for Appellants at 76a.
 
 
 53
 25. The defendants shall, by January 1, 1979, arrange for a training program for present and future jail nurses in the area of psychiatric nursing. All present jail nurses must enroll in the program as soon as it is established. All nurses employed by the jail in the future shall, within six months of their date of employment, complete said training course.
 
 
 54
 Id. at 96a-97a.
 
 
 55
 The testimony concerning adequate psychiatric care was conflicting. Appellants presented expert witnesses supporting the necessity for expanded services. Appellees presented expert testimony to the contrary. Dr. Alphonse J. Cipriani described how the jail physicians referred appropriate cases to a psychiatric setting if the symptoms warranted:
 
 
 56
 Q. But in the case of men who have psychiatric disorders, specifically, (the nurses) are not trained?
 
 
 57
 A. No. As I indicated before, we are into a philosophical question, I would repeat for the Court, this is a County Jail with a medical infirmary, a medical hospital, a medical restraining room. We are a County Jail.
 
 
 58
 I am not, and we are not a psychiatric hospital. We are not a psychiatric unit. The patients, as I said before, get adequate care until final disposition is made.
 
 
 59
 Now if final disposition means within 24 hours I should have this patient in a general hospital, that's where he or she goes. If it means that this patient should be in a psychiatric setting immediately even before the psychiatric consultation agrees, I told you, that is the way that patient would be handled, the disposition.
 
 
 60
 But in terms of being a County Jail, they are getting good, adequate psychiatric and general medical care for that period of time that they are there until the Court decides the final disposition.
 
 
 61
 It is my opinion. That's what I have observed in three months.
 
 
 62
 Appendix for Appellees at 6b.
 
 
 63
 Testimony was also adduced that a jail physician is on call twenty-four hours a day and is actually on the premises approximately two and one-half hours a day, and that the services of the Allegheny County Behavior Clinic, an arm of the court of common pleas, are available to the inmates. Five psychiatrists and two psychologists from the clinic "have direct involvement in the Allegheny County Jail." Appendix for Appellants at 369a. The director of the clinic testified that the clinic acts as "psychiatric consultant to Dr. Smith, the jail physician." Id. at 372a. Upon request of the jail physician, an inmate will be examined by a Behavior Clinic psychiatrist, a diagnosis will be made, and medication or other treatment will be recommended to the jail physician. Id. at 374a. These psychiatrists are available five days a week. Id. at 385a.
 
 
 64
 On this record I cannot conclude that appellants met either their burden under Estelle of proving "deliberate indifference to serious medical needs" or the test of Wolfish, that the professional psychiatric care was "(designed) for the purpose of punishment," or if not expressly so designed, was "arbitrary or purposeless." For their part, the majority conclude that they "are not confident that the record accurately reflects existing conditions at the jail." Maj. Op., at 763. The function of an appellate court in the Anglo-American tradition, however, is to review the judgment of the district court based on the record before it. Having reviewed that record I would affirm the judgment of the district court in all respects.
 
 
 
 [1]
 Inmates are allowed to have visitors three times per week for one hour
 
 
 [2]
 Arnold Pontesso was appointed by the district court as its advisor in this case. He previously served as Director of Corrections for the State of Oklahoma as well as Warden of the Federal Reformatory in El Reno, Oklahoma
 
 
 [3]
 We note that the restriction at issue here does not prevent visits from non-inmates but only prohibits contact visits. See Valentine v. Englehart, 474 F.Supp. 294 (D.N.J., 1979) (court holds ban on visits by children unconstitutional under Bell v. Wolfish.)
 
 
 [4]
 Although the issue was not before it in Wolfish, the Court implied that prohibition of contact visits is a reasonable alternative to body cavity searches in preventing contraband from entering a jail or prison. Bell v. Wolfish, 441 U.S. at 559-60, 99 S.Ct. 1861 n. 40
 
 
 [5]
 Currently, inmates who have been receiving methadone treatment from clinics located outside Allegheny County receive no methadone treatment after incarceration. The district court found this "uneven treatment" to constitute a violation of the Equal Protection Clause. Nevertheless, the court apparently ordered no relief in this regard and the parties do not raise the issue on appeal
 
 
 [6]
 The district court, however, found that the inmate can request other medication to help ease the effects of his methadone or heroin withdrawal. Those dispensed at the jail included the tranquilizer Sparine and such medicine as Tylenol, Maalox, and Benadryl
 
 
 [7]
 We caution, however, that even though the System of care may itself be constitutionally sufficient the refusal to make that system of care available to a particular inmate may itself be unconstitutional. See Bowring v. Godwin, supra. We are not faced with that issue here, however, and express no opinion as to the relevant standards to be applied in making that determination
 
 
 [8]
 The Board, for instance, alleged at oral argument that the improved recordkeeping required by the district court's order indicates that psychiatrists from the Behavior Clinic now spend a substantial amount of time at the jail
 
 
 [9]
 The district court may receive whatever additional evidence it deems relevant in making that determination