Emmitt VALENTINE; William Coles; Bruce Cunningham; Nathaniel Dash; Winfred Gray; Tony McCutchen; Damon Wilder, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Edwin ENGLEHARDT, Sheriff, Passaic County; John DeYoung, Warden, Passaic County Jail; Edward O'Byrne, Freeholder-Director; Joseph Bubba, Freeholder; Louise Friedman, Freeholder; S. M. Terry LaCorte, Freeholder; James Roe, Freeholder; Joseph Russo; Freeholder-Deputy Director; Cyril Yannarelli, Freeholder; all their successors in office, Defendants.

Civ. A. No. 78–270.

United States District Court,
D. New Jersey.

July 21, 1980.

Jeffry A. Mintz, Acting Director, Dept. of the Public Advocate, Trenton, N. J., for plaintiffs.

Martin Verp, Passaic County Counsel by Randy Kopf and James V. Convery, Asst. County Counsels, Paterson, N. J., for defendants.

OPINION

STERN, District Judge.

In the final stage of this class action brought pursuant to Title 42 United States Code, § 1983, by the inmates of the Passaic

County Jail,[1] the Court must decide whether the institution's ban on contact visitation is constitutional. The Court has heard three days of testimony, received the Report and Recommendation of Special Master Edward J. Dauber, Esquire,[2] and reviewed the objections and comments of the parties with respect to the report. Under the circumstances existing in the Passaic County Jail, the Court finds the denial of contact visitation to be constitutional.

The three-story, twenty-four year old Passaic County Jail houses an average population of 300 men and women, the majority of whom are pretrial detainees. Although some inmates are incarcerated in the jail for up to one year, most pretrial detainees stay less than six weeks.

All visits, except those involving attorneys, clergymen, law enforcement officials, or social workers, and those occurring under extraordinary circumstances, are non-contact. Inmates and visitors stand on separate sides of a glass window in booths and communicate via telephone. Under the current visitation policy[3] all inmates whose last name begins with the letters A–L are entitled to visits on Saturdays between 9:00 and 10:30 A.M. and 12:30 and 4:00 P.M. The remaining inmates receive visitors on Sundays between 9:00 and 10:30 A.M. and 7:00 and 9:00 P.M. The standard length of each visit is thirty minutes, with inmates entitled to two adult visitors at one time. The length of the visits is expanded or curtailed depending on the number of waiting visitors. In addition, all inmates are entitled to "Visits by Appointment" during the weekdays. Requests for these visits must be made two days in advance and are granted unless there is a justifiable institutional reason for denial.

Children's visits are conducted Monday and Tuesday nights from 7:00 to 9:00 P.M. The jail population is divided alphabetically so that each inmate who wishes to see his or her children receives at least one, thirty-minute visit per week. An inmate may visit with all his or her children simultaneously, if they are accompanied by a responsible adult.

There are two male and one female visiting areas on the second and third floors of the building, well within the security perimeter of the jail. During regularly scheduled visitation periods, all general jail activities cease and inmates not receiving visitors must remain locked in their cells.[4] The correctional staff is fully occupied with the visitation process, the supervision of inmates, and other necessary duties such as the receipt and release of inmates.

Visitors wait on chairs located in or near the cellblock area and some inmates must pass within a few feet of the waiting visitors to get to the booths. Visitors, who may bring their belongings with them, do not pass through any metal detector or similar device, and are not searched prior to or after a visit. At the conclusion of the visits, the areas to which the visitors had access are searched; the inmates are not.

The thrust of the visitation plan is to provide the maximum amount of visitation possible under existing conditions, without wholesale searches of inmates and visitors. The parties and the Master agree that the present plan is adequate with respect to the number of visitors allowed and amount of time permitted.

Plaintiffs contend, however, that at least some portion of the jail population is enti-

---

1. The history of this litigation is set forth in *Valentine v. Englehardt*, 474 F.Supp. 294 (D.N.J.1979).

2. This Court wishes to thank Mr. Dauber for the time and attention he gave to his appointment, and to commend him for his excellent, thorough Report and Recommendation. His assistance has been invaluable.

3. Prior to this Court's Opinion and Order of July 18, 1979, each inmate received a maximum of two adult visitors during one weekend visitation period for ten to fifteen minutes per visitor. Only under extraordinary circumstances could an inmate schedule a "special visit." *See Valentine v. Englehardt, supra*, at 298. As discussed above, visitation has been greatly expanded.

4. During visits by appointment the jail continues its normal daily operational functions.

tled to contact visitation.[5] They argue that the defendants' denial of contact visitation is arbitrary and based upon exaggerated and speculative concerns about institutional security.

Defendants vigorously oppose any contact visitation, arguing that no such program could be implemented without reducing the level of "security, custody and control" at the jail. Specifically, they contend that contact visitation would lead to an increase in drugs and weapons entering the jail and would enhance the opportunity for and probability of escape. They further argue that pressure would be exerted upon inmates receiving such visits to bring in contraband for those not entitled to contact. Defendants state that contact visitation would interfere with other inmate and staff activities at the jail and would require an increase in staff and construction expenditures, which might jeopardize a proposed fourth floor addition to the jail. Defendants further urge that contact visitation would diminish inmate privacy because closer staff monitoring would be required during the visits and strip searches would be necessary.

The Master, after visits to the jail and hearings involving jail personnel, concluded that the jail officials' subjective determination to deny contact visitation was "arbitrary and . . . an exaggerated response to the concerns raised by the prospect of contact visitation." Master's Report at 55.[6] In his view, a limited contact visitation program could reasonably be instituted at the jail "without increasing the security, financial, staffing and psychological costs

feared by the Jail authorities and without interfering with the routine functioning and other activities of the Jail." Master's Report at 57.

█ The Master's Report and Recommendation was based solely upon this Court's Opinion of July 18, 1979. In the interim the United States Court of Appeals for the Third Circuit addressed the issue of contact visitation for the first time since the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Inmates of the Allegheny County Jail v. Pierce*, 612 F.2d 754 (3rd Cir. 1979). After carefully considering the Third Circuit opinion, this Court must reject the Master's recommendation. We find that, under the prevailing conditions at the Passaic County Jail, the total ban on contact visits is constitutional.

In *Inmates of the Allegheny County Jail v. Pierce, supra*, the district court found that many of the conditions of confinement in the Allegheny County, Pennsylvania, Jail violated the constitutional rights of the pretrial detainees incarcerated there, but held that the denial of contact visits did not. The court found visitation procedures substantially similar to those employed at the Passaic County Jail to be a legitimate restriction in light of the security interests of the Allegheny County Jail, although, as here, a court-appointed adviser had recommended implementation of a limited program of contact visits.

On appeal, the plaintiffs argued that under *Bell v. Wolfish, supra*, the ban on contact visits denied them due process.[7] The

5. Plaintiffs have never claimed that the entire jail population should receive contact visits. Rather, they argue that once the classification system mandated by the Settlement Order of April 10, 1979, is established, there will be a reasonable basis for determining which inmates are trustworthy enough to have contact with their visitors.

6. All references to "Master's Report" contained herein are to the Special Master's Report Re: Visitation, filed January 29, 1980.

7. The standard set forth in *Bell v. Wolfish* for determining whether a restriction imposed upon pretrial detainees is constitutional is

whether the restriction "amount(s) to punishment of the detainee." *Bell v. Wolfish, supra*, 441 U.S. at 535, 99 S.Ct. at 1872.

Absent a showing of expressed intent to punish on the part of detention facility officials, that determination generally will turn on "[w]hether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." . . .

Third Circuit found the inmates' arguments "unpersuasive." 612 F.2d at 759. It noted that testimony which the district court had chosen to credit indicated that the primary purpose of the denial of contact was to prevent the introduction of contraband into the jail. After finding the acceptance of the testimony not to be clearly erroneous, the Court of Appeals held:

> [E]ven though the chance of additional contraband reaching the jail as a result of contact visits may be remote, jail officials may reasonably act to remove even that remote possibility.

Id. The Court further noted that "the existence of other less restrictive alternatives [to an absolute ban on contact visitation] is . . . not dispositive." Id. The Court then addressed the inmates' contentions that the prohibition "encroaches upon a fundamental zone of privacy, the family relationship, and, therefore, is deserving of heightened scrutiny":

> [T]he prohibition of contact visits is a reasonable response to legitimate concerns of prison security. An inmate is not precluded from visiting with members of his family and others, but only from physical contact with those individuals. Thus the restriction is specifically tailored to meet the perceived security problem. Further, the district court noted that, were contact visits to be allowed, other costly and extensive security measures would be required to prevent the entry of contraband. . . . The [dis-

trict] court found that requiring these in the antiquated facilities of the Allegheny County Jail "would place an undue burden on the administration." In such circumstances, a ban on contact visits represents a reasonable choice by prison officials between alternative methods of protecting the legitimate security interests of the jail.

Id. at 759–60.

The Allegheny County Jail case is directly on point. Here, as in that action, there is absolutely no evidence that the Passaic County Jail administration bans contact visits for purposes of punishment. Valentine v. Englehardt, supra, at 300 n.12; Master's Report at 51. Further, both facilities are old, overcrowded and ill-suited for visitation. All the inmates are currently allowed non-contact visits with their entire family and extra security measures would be necessary to implement contact visits. Finally, experts who testified on behalf of defendants—and plaintiffs as well—admitted that contact visitation enhances the possibility of contraband entering the jail and the opportunity for escape. Thus, if contact visits were permitted, there is more than the "remote" possibility of additional contraband entering the jail which alone permits jail officials to reasonably deny inmates contact with family and friends.

■ Moreover, whether or not pretrial detainees have a fundamental right to visitation,[8] the *manner* in which such visits

---

Conversely if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

Id. at 538, 99 S.Ct. at 1873–4. The Supreme Court admonished lower courts that "the government's interest in maintaining security and order and operating the institutions in a manageable fashion . . . [is] peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their judgment in such matters." Id. at 540–41 n. 23, 99 S.Ct. at 1875 n.

23. *See Valentine v. Englehardt, supra*, 474 F.Supp. at 299–300.

8. Other courts have disagreed on whether pretrial detainees have a constitutional right to visitation. *Compare, e. g., Feazell v. Augusta County Jail*, 401 F.Supp. 405, 407 (W.D.Va. 1975) ("Visiting privileges are properly within the determination of internal prison considerations."); and *Henry v. State of Delaware*, 368 F.Supp. 286, 288 (D.Del.1973) ("[T]here is no federal constitutional or statutory right to visitation privileges."), *with Feeley v. Sampson*, 570 F.2d 364, 372 (1st Cir. 1978) ("A refusal . . . to allow the ordinary detainee any visitation privileges . . . would be unconstitutional."); and *Collins v. Schoonfield*, 344 F.Supp. 257, 279 (D.Md.1972) ("Constitutional questions" raised in connection with complete denial of non-legal visits to pretrial detainees.)

occur, like other conditions of confinement in our nation's jails, is committed to the sound discretion of the executive branch so long as the latter acts in a reasonable manner. Although reasonable people certainly might differ, the Passaic County Jail officials have determined that the burdens of security measures necessary to permit contact visitation outweigh the benefits of such visitation to the inmates.[9] Based upon the record before us, and in light of the particular physical plan of the Passaic County Jail, we cannot find that judgment to be erroneous, and, accordingly, we must defer to it.

Earlier in this litigation this Court declared that the defendants had no reasonable basis for a complete ban on children's visits, labeling the right of a parent to see his or her child "one of the most fundamental of all human rights." *Valentine v. Englehardt,* supra, at 302.

9. The record indicates that even the present visitation policy, under which visitors enter the security perimeter of the jail, presents some security problems. Furthermore, there is conflicting evidence as to whether all the inmates desire contact visits. It is possible that the increased security measures which attend the implementation of contact visitation—such as strip searches and the search of visitors' belongings—may actually chill visitation by some inmates and their guests, who may not want to undergo such intrusive and embarrassing procedures.